863 So.2d 271 (2003)
Ray Lamar JOHNSTON, Appellant,
v.
STATE of Florida, Appellee.
No. SC01-1914.
Supreme Court of Florida.
October 16, 2003.
*274 James Marion Moorman, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Kimberly Nolen Hopkins, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
Ray Lamar Johnston appeals his conviction of first-degree murder and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the conviction and sentence.

FACTUAL AND PROCEDURAL BACKGROUND
On either February 6 or 7, 1997, Janice Nugent, a forty-seven-year-old divorced woman, was strangled to death in her Tampa home by Ray Lamar Johnston. Nugent's body was discovered by her son-in law, John McCarthy, at about 11 p.m. on Friday, February 7, 1997. When McCarthy arrived at Nugent's house, he noticed the side door to the house was ajar and keys were still in the door lock. Nugent's car was still in the carport. McCarthy entered the house and discovered Nugent's body, wrapped in a bed comforter and submerged in the bathtub. Nugent was wearing only panties and a brassiere.
The medical examiner, Dr. Julia Martin, testified that the time of Nugent's death was between 1 a.m. on Thursday, February 6, and 1 a.m. on Friday, February 7. Dr. Martin determined that the cause of death was manual strangulation, and that Nugent was murdered before she was submerged in the bathtub. There was extensive bruising to Nugent's neck and shoulder area. Dr. Martin concluded that the strangulation in this case was not by constant, continuous compression, but rather was "more of a manual throttling ... meaning it was more pressure, release, pressure, release. There was some fighting activity."[1] Defensive bruising on Nugent's arms and hands and defensive fingernail injuries on her nose indicated that Nugent struggled with her assailant and attempted to pull the assailant's hands off her face.
Nugent sustained three to five blunt impact "pattern type injuries" on her buttocks and hips. Dr. Martin testified that within a reasonable medical probability, one or more of the patterned injuries on Nugent's buttocks were made by a belt. The other pattern type injuries could have been made by a belt or some other implement, possibly a vacuum cleaner hose. The belt that caused the injuries was never recovered.
Kelli McCarthy, Nugent's daughter, testified that Nugent retained all of her used answering machine tapes and stored them in a bureau drawer in her bedroom. The answering machine tapes and a portable phone with caller ID were not found. There were no signs of forced entry and *275 no signs of a struggle in any room other than the master bedroom. In the master bedroom a lamp on a bedside table had been broken and partially overturned. Nugent's massage table was open in the living room and jars of cocoa butter and massage oil were found on a nearby piece of furniture. McCarthy testified that Nugent was a massage therapist and would bring the table into the living room to give massages. McCarthy described Nugent as a creature of habit and a "neat freak" and testified that Nugent would mop her kitchen floor every week. It would be very uncharacteristic of her to leave a cup unwashed for three or four weeks. She also testified that Nugent habitually bathed twice a day. There was only one bathtub in the house.
The last person to see Nugent alive, other than Johnston, was Ron Pliego. Pliego arrived at Nugent's house on Wednesday, February 5, 1997, around midnight and left at around 1 a.m. on Thursday morning. Pliego did not eat or drink anything while at Nugent's house and had some form of sexual encounter[2] with Nugent. Pliego could not remember whether the massage table was in Nugent's living room when he left. Pliego was eliminated as a suspect in the Nugent murder after he provided police with his fingerprints and DNA.
Nugent, Johnston, and Frances Aberle, an acquaintance of Nugent who had dated Johnston, were regulars at a bar named "Malio's." A short time before the murder, Aberle told Johnston that she would no longer go to Malio's with him because she was afraid Nugent would retaliate against her for being with Johnston. Several days after the murder, Aberle and Johnston spoke about the murder and Aberle said, "I just can't understand someone doing that. Why? No matter what somebody did, why somebody would do that." Ray agreed with her and then said, "Well, now there's no reason you can't go to Malio's with me."
Johnston's fingerprints were found on the bottom of a plastic cup under the kitchen table and on the cold water knob of the bathtub, near Nugent's body. Shoe tracks consistent with shoes recovered from a search of Johnston's apartment were found on Nugent's kitchen floor. The State could not prove that the shoe tracks came from the exact shoes owned by Johnston, but did establish that the tracks were consistent with the tracks made by Johnston's shoes. DNA evidence matching Johnston's DNA profile was found on a bed sheet in Nugent's master bedroom. The odds of another person matching Johnston's DNA profile are one in 279 trillion. The mixture stain from which the DNA evidence was found was consistent with blood, saliva, or sweat, but it was not consistent with semen. No evidence of sexual battery was introduced at trial.
Detectives Noblitt and Stanton interviewed Johnston three times before the Nugent trial. In the first interview, Johnston told the detectives that he knew Nugent, and that he met her at Malio's. He had danced with her a few times, and they went out on one dinner date several weeks before Valentine's Day. After the date, they went back to Nugent's house.[3] Nugent took him through her kitchen to a locked room at the rear of the house. Nugent began to act strangely and Johnston left the house. Johnston said he never went out with Janice again; he was in *276 the house for no more than half an hour that night; he and Janice did not have sex; and they did not have a fight. Johnston denied killing Nugent.
The second interview took place six days later. By that time, the detectives had received information that Johnston's fingerprint was found on the shower knob in Nugent's bathroom. Detective Noblitt asked Johnston to go back over the events of his dinner date with Nugent, and Johnston reiterated the story he gave in the first interview. Noblitt then said, "Your fingerprint is in a place very near where Ms. Nugent's body is." Noblitt did not indicate exactly where the fingerprint was found. Johnston said he was only in Nugent's house once and only went in the rooms he had previously mentioned; then Johnston stopped and said "Wait a minute, I may have gone in the computer room." Noblitt countered, "That won't explain the fingerprint," and told Johnston he did not believe he was telling him the truth. Noblitt asked Johnston if he knew where the body was found. At first Johnston said no, then he said, "Oh, I think it was found in the bathroom." Asked how he knew that, Johnston said he had read it in the newspaper. A short time later, Johnston mentioned to the detectives that he has occasional blackouts and seizures. Johnston told the detectives, "Sometimes I get to doing something and doing it and doing it and when it's over I can't remember what I've done." Detective Stanton asked Johnston, "Is that what happened with you and Janice?" and Johnston said, "No, I did not kill Janice."
Detective Noblitt insisted that "[s]omething happened. Your fingerprints are in a place where I know you were there the night she was killed." Johnston stopped for a second and said, "I went to the bathroom." Noblitt took that as meaning that he went in to urinate, and he insisted to Johnston that he did not believe him and the fingerprint did not get there that way. Johnston thought about it for a few minutes and then said, "Okay, I'm going to tell you the truth." He then told the detectives that after he and Nugent returned to her house, they had a conversation about ghosts, which Nugent believed lived in her house. Nugent offered him a massage and Johnston accepted. Johnston took off his clothes and got on the massage table. Nugent heated some massage oil, and when she poured it on him it burned his buttocks and the back of his legs. He jumped up and ran into the shower, washed himself off, and fled Nugent's house in his underwear. Johnston told Noblitt that he was scared and that is why he did not mention these facts during the first interview.
The third interview with Johnston took place on September 2, 1997. By that time, the detectives had received DNA test results indicating that Johnston's bodily fluid was found on a sheet in Nugent's master bedroom. The detectives advised Johnston of his constitutional rights, as they had done in the previous interviews, and told him they wanted to talk more about Nugent's homicide. Noblitt testified:
I told him that we executed our search warrant; told him we had only taken a few things; that most of his property was still there, and had some small talk about who was going to pick up whatever remaining property he had. And Mr. Johnston sat there and looked at myself and Detective Stanton and said, "I think I have a problem."
Johnston then told the detectives that he had another person named Dwight living inside of him. Johnston said that Dwight was "very mean" and "I got to be cautious." Noblitt testified that Johnston "sat and put his fists together and clinched his fists real tight with his knuckles almost *277 turning white and leaned back in his chair and kind of closed his eyes ... and he said `You've got to see him man.'" During the same interview Johnston denied that "Dwight" killed Nugent.
The State filed a motion to rely upon Williams[4] rule evidence of Johnston's prior first-degree murder conviction. After two hearings on the subject, the trial court granted the State's motion to rely upon Williams rule evidence and issued a ten-page order detailing the analysis the court conducted in reviewing the motion. The State presented evidence that on March 13, 2000, Johnston was convicted of the first-degree murder of Leanne Coryell. Coryell was murdered on August 19, 1997, six months after the Nugent murder. Johnston confessed to the Coryell murder during the penalty phase of the Coryell trial, after the jury had convicted him of the murder.
Coryell was a thirty-year-old, physically fit, blond-haired, attractive woman. She was forcibly abducted from her apartment by Johnston and taken to a nearby park. Her body was found nude and partially submerged in a pond. Coryell's clothing was scattered on the ground in the vicinity of the pond, and her car was found nearby in a church parking lot. The cause of her death was strangulation, most likely manual strangulation. However, the possibility that a ligature was used could not be ruled out by the medical examiner. Coryell was most likely already dead when her body was dragged and placed into the water. There was evidence of a sexual battery.
Johnston and Coryell resided in different buildings of the same apartment complex. Certain property, including an ATM card, was taken from Coryell, and money was later withdrawn from her bank account using that card. There were pattern injuries on Coryell's buttocks that were consistent with Coryell having been beaten with a belt. The pattern injuries matched the pattern of Coryell's belt found at the scene.
During the Nugent trial, the State read into the record parts of Johnston's confession to the Coryell murder. In this confession, Johnston admitted killing Coryell, but said he did not rape or sexually assault her. Johnston said that after she was already dead he attempted to cover himself by making it appear as if Coryell had been assaulted. In furtherance of this objective, he removed Coryell's clothes and scattered them, kicked her in the crotch area, struck her with her belt, and dragged her into the pond. Johnston admitted that he knew chlorinated water, and even water itself, would remove trace evidence, and acknowledged that he took steps to cover up what he had done.
During his confession to the Coryell murder, Johnston referred to "Dwight," the entity which purportedly lived inside him. A psychologist had testified earlier in the Coryell penalty phase that Johnston expressed a fear that another personality within him named "Dwight" had possibly committed the Coryell murder. However, Johnston admitted in his confession that "Dwight" was not responsible for the Coryell murder.
The trial court in the Nugent case noted that the Williams rule evidence of the Coryell murder was presented for sixty-two minutes at trial.
On October 6, 2000, the jury found Johnston guilty of the first-degree murder of Janice Nugent. The trial court conducted the penalty phase of Johnston's trial, during which both the State and Johnston presented evidence. The jury recommended by a seven-to-five vote that Johnston *278 be sentenced to death. Johnston presented a motion for mistrial as to the penalty phase, and the trial court granted this motion. A new penalty phase was conducted.
The jury in the second penalty phase recommended by an eleven-to-one vote that Johnston be sentenced to death. The trial court followed the jury's recommendation and imposed a death sentence, finding and weighing two aggravating factors,[5] one statutory mitigating factor,[6] and twenty-six nonstatutory mitigating factors.[7] On direct appeal, Johnston raises five issues.

I. IMPLIED ADMISSION
Johnston argues that the trial court abused its discretion and committed harmful error by allowing the State to introduce, as implied admissions, statements made by Johnston during custodial interrogation concerning a person living within him named "Dwight." Johnston argues that the statements were irrelevant to prove the charged offense and showed only criminal or violent propensity, bad character, and possible lunacy.

A. APPLICABLE LAW
A trial judge's ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion. See Carpenter v. State, 785 So.2d 1182 (Fla. 2001) (citing Blanco v. State, 452 So.2d 520, 523 (Fla.1984)). The trial court's discretion is limited by the rules of evidence. See Nardone v. State, 798 So.2d 870, 874 (Fla. 4th DCA 2001).
In order to be admissible, an admission by a party opponent must be relevant, i.e., it must have some logical bearing on an issue of material fact. See Swafford v. State, 533 So.2d 270, 274 (Fla.1988). In *279 the context of a criminal trial, an admission by the defendant is admissible if it tends in some way, when taken together with other facts, to establish guilt. Id. The evidence must "be relevant to a material issue other than propensity or bad character." Drake v. State, 441 So.2d 1079, 1082 (Fla.1983).
In Swafford, this Court considered the admissibility of a defendant's statements in a trial for first-degree murder and sexual battery. Swafford was on trial for the abduction, rape, and murder of a gas station attendant. The victim had been shot nine times, twice in the head. Id. at 272. A witness for the State testified that two months after the murder Swafford suggested getting a girl and said, "[W]e'll do anything we want to and I'll shoot her." Id. at 273. Swafford and the witness drove to a department store parking lot that same night. Id. The witness asked Swafford whether he would not be "bothered" after abducting, raping and murdering a victim selected in a parking lot. Id. Swafford responded, "[Y]ou just get used to it." Id. This Court said:
Swafford's statement that "you just get used to it," when viewed in the context of his having just said that they could get a girl, do anything they wanted to with her and shoot her twice in the head so there wouldn't be any witnesses, was evidence which tended to prove that he had committed just such a crime in Daytona Beach only two months before.
Id. at 273-74.
Likewise, in Johnson v. State, 438 So.2d 774, 779 (Fla.1983), this Court held that the defendant's statement that he would "not mind shooting people to obtain money" was admissible. The same evening that Johnson made the statement, a deputy sheriff and a taxicab driver were shot and the taxicab driver was robbed.

B. APPLICATION OF LAW
After a proffer of testimony concerning the "Dwight" statements, the trial court overruled the defense's objection and admitted the "Dwight" statements as implied admissions in reliance on this Court's reasoning in Swafford. The "Dwight" statements were made by Johnston to Detectives Noblitt and Stanton during their third interview with Johnston, after the detectives advised Johnston that they had recovered his fingerprints close to Nugent's body and had executed a search warrant on his apartment. At that time Johnston said to the detectives, "I think I have a problem." Johnston told the detectives that he had another person named Dwight living inside of him and said that Dwight was "very mean" and "I got to be cautious." Detective Noblitt testified that Johnston "sat and put his fists together and clenched his fists real tight with his knuckles almost turning white and leaned back in his chair and kind of closed his eyes ... and he said `You've got to see him, man.'" During the same interview Johnston denied that Dwight killed Nugent.
At the time the statements were made, Johnston was in jail awaiting trial for the Coryell murder. He was fully aware of the purpose of the interview, had been advised of his constitutional rights, had been told that his fingerprints were found very close to the victim, and had been told that a search warrant had been executed on his apartment. Additionally, Williams rule evidence established that Johnston blamed Dwight for the Coryell murder. Although Johnston did not expressly blame Dwight for the Nugent murder, the fact that Johnston spoke of Dwight while being questioned on his involvement in the Nugent murder is significant.
Pursuant to the holding in Swafford, the question for this Court is whether the *280 "Dwight" statements constitute evidence tending to prove that Johnston committed the Nugent murder. See Swafford, 533 So.2d at 273. A review of the record shows that the statements, taken in the context in which they were made and in light of the statements made during the Coryell murder, constitute evidence tending to show that Johnston was involved in the Nugent murder. The statements are relevant to show more than just propensity or bad character. We therefore hold that the admission of the "Dwight" statements was not an abuse of discretion.

II. WILLIAMS RULE EVIDENCE

Johnston argues that the trial court committed harmful error by allowing the State to introduce Williams rule evidence pertaining to the Coryell murder because the dissimilarities between the Nugent and Coryell murders are pervasive.

A. APPLICABLE LAW
Under the Williams rule, similar fact evidence is generally admissible, even though it reveals the commission of another crime, as long as the evidence is relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. See Williams v. State, 110 So.2d 654 (Fla. 1959). In Drake v. State, 400 So.2d 1217 (Fla.1981), this Court stated:
The mode of operating theory of proving identity is based on both the similarity of and the unusual nature of the factual situations being compared. A mere general similarity will not render the similar facts legally relevant to show identity. There must be identifiable points of similarity which pervade the compared factual situations. Given sufficient similarity, in order for the similar facts to be relevant the points of similarity must have some special character or be so unusual as to point to the defendant.
Id. at 1219.
We held in Drake, 400 So.2d at 1219, Peek v. State, 488 So.2d 52 (Fla.1986), and Thompson v. State, 494 So.2d 203 (Fla. 1986), that prior sexual crimes of the defendants in those cases were inadmissible in their murder prosecutions because the collateral crimes were insufficiently similar. See Chandler v. State, 702 So.2d 186, 192 (Fla.1997). However, the only similarity between the crimes in Drake was that both victims' hands had been tied behind their backs and both victims had left a bar with the defendant. Drake, 400 So.2d at 1219. In Peek, the principal similarities were that the crimes occurred within two months of each other in the same town, both women were white females, and both women were raped. See Peek, 488 So.2d at 55. In Thompson, the primary similarities were that both victims were approximately the same age and build, both crimes occurred near a particular church parking lot, and the defendant was having domestic problems on both occasions. See Thompson, 494 So.2d at 204. In each of these cases, the court disallowed Williams rule evidence based on the few similarities and the many significant dissimilarities.
Conversely, this Court admitted Williams rule evidence in Crump v. State, 622 So.2d 963 (Fla.1993). In Crump, the police found the nude body of a prostitute (Clark) in an open area adjacent to a Tampa cemetery. An initial examination of the body showed that Clark had been manually strangled and had ligature marks on her wrists consistent with being bound. Ten months later, the police found the nude body of another prostitute (Smith) in an open field adjacent to a different Tampa cemetery. Smith also had been manually strangled and had ligature marks on her wrists consistent with having been bound. Crump was convicted of the Smith murder, *281 and the State attempted to introduce the Smith murder as Williams rule evidence in the Clark trial. This Court stated:
This Court has upheld the use of collateral crime evidence when the common features considered in conjunction with each other establish a sufficiently unusual pattern of criminal activity. See Chandler v. State, 442 So.2d 171, 173 (Fla.1983). Although the common features between Smith's murder and Clark's murder may not be unusual when considered individually, taken together these features establish a sufficiently unusual pattern of criminal activity. The common features of the two crimes include: both victims were African-American women with a similar physical build and age (Clark was twenty-eight years old, five feet, two inches and weighed 117 pounds; Smith was thirty-four years old, five feet, five inches tall and weighed 120 pounds); Crump admitted to giving a ride to each victim in his truck in the same area, off Columbus Boulevard in Tampa; Crump admitted to the police that he argued with each victim while giving the victims a ride in his truck; both victims' bodies showed evidence of ligature marks on the wrists; both victims died from manual strangulation; both victims' bodies were found nude and uncovered in an area adjacent to cemeteries within the distance of a mile from each other; and the victims were murdered at different sites from where the bodies were discovered. The cumulative effect of the numerous similarities between the two crimes establishes an unusual modus operandi which identifies Crump as Clark's murderer. Thus, we find no error in the admission of the Williams rule evidence.
Crump, 622 So.2d at 968.

B. APPLICATION OF LAW
The question before this Court is whether there are identifiable points of similarity which pervade the factual situations in the Coryell and Nugent murders. If identifiable points of similarity are evident, this Court must then determine whether the dissimilarities between the factual situations are insubstantial. See Gore v. State, 599 So.2d 978, 983-84 (Fla. 1992).
After a hearing on the State's pretrial motion to rely upon Williams rule evidence, the trial court prepared a detailed, written pretrial order on the issue. In its order, the trial court found the following similarities between the Coryell murder and the Nugent murder:
a. Both bodies were submerged in shallow water after death.... Coryell was dumped in a pond, face down, while Nugent was dumped in a bathtub of running water.... However, during the penalty phase of the Coryell murder case [Johnston] testified. [Johnston] testified that he originally wanted to take [Coryell's] body up to the victim's apartment, but was scared that she had some type of alarm system. Additionally, [Johnston] testified that he submerged [Coryell's] body in the pond because he thought the water would destroy evidence....[T]he use of water in both instances ... with the... stated belief that water would destroy evidence makes the similarities between the two cases profound....
b. Both victims were single white females with blonde hair and medium build.
c. The location of the residences of both victims were known to [Johnston].
d. [Johnston] knew both victims prior to the murders. [Johnston] dated and/or had a social acquaintance with Nugent. But [Johnston] only lived in *282 the same complex as Coryell and had only greeted Coryell.
e.... Both victims were strangled to death in a violent manner and with the use of great force which left multiple areas of dark, widespread contusions on the victims' neck.
f....Both victims were left with distinct patterned bruises on their buttocks. In the Coryell case the medical examiner identified the cause of the bruising as [the victim's] belt. In the Nugent case the medical examiner will testify that the bruises were consistent with the use of a belt.
g....Both victims had multiple blows from a fist to the head and upper body.
As the trial court noted in its order admitting the Williams rule evidence, there are a number of similarities between the Coryell and Nugent murders. In addition to the similarities set forth above, evidence in each case established that both victims were already dead when they were submerged in the water, and both victims were, at least partially, strangled from behind.
The similar belt pattern injuries on the buttocks of both victims are possibly the most unique similarities between the Nugent and Coryell murders. Johnston alleges that the State failed to show that these injuries were similar. However, Dr. Martin, the medical examiner in the Nugent case, testified that within a reasonable medical probability, one or more of the patterned injuries on Nugent's buttocks came from a belt. Likewise, the medical examiner in the Coryell case testified that Coryell was beaten on the buttocks with a belt. During the penalty phase of the Coryell case, Johnston confessed to beating Coryell's buttocks with a belt.
The trial court noted the following dissimilarities between the two murders:
1. Johnston only knew Coryell by sight as a neighbor who he greeted on occasion, while he actually socialized with Nugent.
2. Coryell was kidnaped and apparently abducted in her own automobile from her apartment complex and then sexually battered in a wooded area adjacent to a church. Nugent was found dead in her own home and there was no evidence of kidnaping or sexual battery, nor were there any signs of forced entry into the home.
3. Coryell was thirty years of age; Nugent was forty-seven.
4. Nugent was found in bra and panties, while Coryell was found nude.
The first dissimilarity is insubstantial and likely the result of a difference in the opportunity with which Johnston was presented, rather than a difference in modus operandi. See Gore, 599 So.2d at 984 (citing Chandler v. State, 442 So.2d 171, 173 (Fla.1983)). The second and fourth dissimilarities are explained by Johnston in his confession during the Coryell penalty phase. Johnston testified that he would have taken Coryell's body to her apartment but was afraid she had an alarm system. Johnston further testified that he did not sexually assault Coryell but wanted to make it appear as if she had been sexually assaulted. Johnston claims to have removed Coryell's clothing in furtherance of this objective. The third dissimilarity is insubstantial in light of the fact that testimony established that both victims were blond, physically fit, attractive women. As this Court stated in Chandler, "We recognize that the crimes are not exactly the same. However, that fact alone does not preclude admission of collateral crime evidence and, indeed, would erect an almost impossible standard of admissibility." Chandler, 702 So.2d at 194.
*283 In this case, there are unusual and pervasive similarities between the Coryell and Nugent murders. The dissimilarities between the two murders are insubstantial and are partially explained by Johnston's own confession in the Coryell case. Because there are pervasive similarities and insubstantial dissimilarities between the Coryell and Nugent murders, we hold that the trial court did not abuse its discretion by finding that the Coryell murder was admissible as Williams rule evidence.

III. SUFFICIENCY OF CIRCUMSTANTIAL EVIDENCE TO PROVE IDENTITY
Johnston argues that the circumstantial evidence presented by the State was insufficient to prove identity. The question for this Court is whether the State presented competent, substantial evidence from which the jury could find that all reasonable hypotheses of innocence were excluded.

A. APPLICABLE LAW
In reviewing a motion for judgment of acquittal, a de novo standard of review applies. See Pagan v. State, 830 So.2d 792, 803 (Fla.2002), cert. denied, ___ U.S. ___, 123 S.Ct. 2278, 156 L.Ed.2d 137 (2003). Generally, an appellate court will not reverse a conviction that is supported by competent, substantial evidence. See Pagan, 830 So.2d at 803 (citing Donaldson v. State, 722 So.2d 177 (Fla.1998); Terry v. State, 668 So.2d 954, 964 (Fla.1996)). There is sufficient evidence to sustain a conviction if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt. See Banks v. State, 732 So.2d 1065 (Fla.1999). "A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt." Orme v. State, 677 So.2d 258, 262 (Fla.1996).
"The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse." Darling v. State, 808 So.2d 145, 155 (Fla.) (quoting State v. Law, 559 So.2d 187, 188 (Fla. 1989)), cert. denied, 537 U.S. 848, 123 S.Ct. 190, 154 L.Ed.2d 78 (2002). In meeting its burden, the State is not required to "rebut conclusively, every possible variation of events" which could be inferred from the evidence, but must introduce competent evidence which is inconsistent with the defendant's theory of events. Darling, 808 So.2d at 156 (quoting Law, 559 So.2d at 189). Once the State meets this threshold burden, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt. Id.

B. APPLICATION OF LAW
The evidence against Johnston can be summarized generally as follows:
1. DNA on master bedroom bed sheet, from a bodily fluid which is consistent with blood, sweat, saliva or mucus, but not semen.
2. Fingerprint on bathtub cold water knob, in close proximity to the body.
3. Fingerprint on a plastic cup under the kitchen table.
4. Two partial shoe tracks which are consistent with Johnston's shoes, but cannot positively be identified as made by Johnston's shoes.
5. Testimony by Kelli McCarthy (Nugent's daughter) concerning Nugent's *284 frequent bathing and house cleaning habits.[8]
6. Williams rule evidence of the similar fact murder of Leanne Coryell.
7. Incriminating statements made by Johnston concerning "Dwight," the alter ego living inside him, during an interview with detectives investigating the Nugent murder.
8. Inconsistent statements made by Johnston concerning the events that transpired when he was in the victim's home.
Johnston argues that the evidence against him is not sufficient for a jury to find that there was no reasonable hypothesis of innocence. As support for this argument, Johnston cites a number of district court of appeal cases, including Shores v. State, 756 So.2d 114 (Fla. 4th DCA 2000), where fingerprint evidence alone was insufficient to sustain a conviction. Johnston also cites a case from this Court, Jaramillo v. State, 417 So.2d 257 (Fla. 1982), as support for his argument. The facts in Jaramillo and in Shores indicate that the only evidence linking the defendants to the crimes in those cases was fingerprint evidence. In those cases the defendants presented reasonable explanations for the presence of their fingerprints at the crime scenes.
In this case, the defense argued that Johnston's DNA was transferred to Nugent's master bedroom bed sheet several weeks before the murder. The State countered this argument with Johnston's statements to law enforcement officers, in which he denied ever entering Nugent's master bedroom. The defense argued that the bathroom fingerprint was left by Johnston several weeks before the murder when he ran into the shower after Nugent burned him with massage oil. The State countered this argument by showing that Johnston did not convey this version of events to the police until Detective Noblitt told him the location of the fingerprint. The defense maintained that the shoe tracks in Nugent's kitchen were not from Johnston's shoes. The State countered this argument by introducing evidence that the shoe impressions were consistent with Johnston's shoes, but could not be conclusively identified as Johnston's shoes because of a lack of identifying characteristics. Clearly, the State introduced evidence inconsistent with Johnston's theory of events.
This Court does not have to determine that every reasonable hypothesis of innocence was excluded in this case. The sole determination we must make is whether there was competent, substantial evidence for the jury to make such a determination. See Darling, 808 So.2d at 156 (citing Law, 559 So.2d at 188-89). The DNA evidence, fingerprint evidence, shoe track evidence, "Dwight" statements and Williams rule evidence of the Coryell murder conviction constitute competent, substantial evidence from which a jury could have concluded that there was no reasonable hypothesis of innocence. Accordingly, we reject Johnston's argument.

IV. SUFFICIENCY OF CIRCUMSTANTIAL EVIDENCE TO PROVE PREMEDITATION
Johnston argues that the circumstantial evidence presented by the State in this case was insufficient to prove premeditation. The question before us is whether *285 the State presented competent, substantial evidence from which the jury could find that all reasonable hypotheses of innocence were excluded.

A. APPLICABLE LAW
Premeditation is defined as "a fully-formed conscious purpose to kill, which exists in the mind of the perpetrator for a sufficient length of time to permit of reflection, and in pursuance of which an act of killing ensues." Blackwood v. State, 777 So.2d 399, 406 (Fla.2000) (quoting Sireci v. State, 399 So.2d 964, 967 (Fla. 1981)). Premeditation may be "formed in a moment and need only exist `for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act.'" Blackwood, 777 So.2d at 406 (quoting DeAngelo v. State, 616 So.2d 440, 441 (Fla.1993)). The State may establish premeditation through circumstantial evidence. See Hoefert v. State, 617 So.2d 1046 (Fla.1993). However, the evidence relied upon by the State must be inconsistent with every other reasonable inference. Id.
Evidence from which premeditation may be inferred includes such matters as "the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Green v. State, 715 So.2d 940, 943 (Fla.1998) (quoting Holton v. State, 573 So.2d 284, 289 (Fla.1990)).
In Holton, this Court held that the circumstantial evidence presented by the State was sufficient to support a jury finding of premeditation and a verdict of first-degree murder. Holton, 573 So.2d at 289. The victim in Holton was found with a ligature securely tied around her neck. Id. The medical examiner determined that death was caused by strangulation. Id. Scratch marks on the defendant's chest indicated the victim had struggled during the attack. Id. The victim's house had been burned, presumably to conceal the crime. Id. This Court held that the evidence was sufficient to prove premeditation. "Because the circumstantial evidence standard does not require the jury to believe the defense version of facts on which the state has produced conflicting evidence, the jury properly could have concluded that Holton's version of the facts was untrue." Id. at 290 (citation omitted).

B. APPLICATION OF LAW
The official cause of Nugent's death was asphyxiation by manual strangulation. Dr. Martin, the medical examiner, opined that the strangulation in this case was not a constant, continuous compression, but was "more of a manual throttling... meaning it was more pressure, release, pressure, release." Dr. Martin testified that Nugent would have been conscious for a good portion of the attack. Defensive bruising on Nugent's arms and hands and defensive fingernail injuries on her nose showed that Nugent struggled with her assailant and attempted to pull the assailant's hands off her face. In light of this Court's holding in Holton, Dr. Martin's testimony was sufficient to establish premeditation. The circumstantial evidence standard does not require the jury to believe the defense's version of the facts when the State has produced conflicting evidence. Thus, the jury properly concluded that Johnston's hypothesis of innocence was rebutted by competent, substantial evidence. See Woods v. State, 733 So.2d 980, 986 (Fla.1999); Crump, 622 So.2d at 971. Based upon the manner of Nugent's death and her antemortem injuries, we find that the State presented sufficient *286 evidence for a jury to conclude that the murder was premeditated.

V. CONSTITUTIONALITY OF FLORIDA'S CAPITAL SENTENCING SCHEME
In his final claim, Johnston asserts that Florida's capital sentencing scheme violates the United States Constitution under the holdings of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This Court has recently addressed this argument and denied relief. See Jones v. State, 845 So.2d 55 (Fla.2003). Additionally, one of the aggravating circumstances the judge considered was Johnston's previous first-degree murder conviction. This prior violent felony conviction alone satisfies constitutional mandates because the conviction was heard by a jury and determined beyond a reasonable doubt. See Doorbal v. State, 837 So.2d 940, 963 (Fla.), cert. denied, ___ U.S. ___, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003). Accordingly, Johnston is not entitled to relief on this claim.

VI. PROPORTIONALITY REVIEW
Finally, although Johnston does not challenge the proportionality of his death sentence, this Court must still ensure that the sentence is proportional. Rimmer v. State, 825 So.2d 304, 331 (Fla.) ("Although appellant does not argue the proportionality of the death sentence in this case, this Court must nevertheless conduct a proportionality review."), cert. denied, 537 U.S. 1034, 123 S.Ct. 567, 154 L.Ed.2d 453 (2002). This review "is not a comparison between the number of aggravating and mitigating circumstances; rather, it is a thoughtful, deliberate proportionality review to consider the totality of the circumstances in a case, and to compare it with other capital cases." Beasley v. State, 774 So.2d 649, 673 (Fla.2000) (internal quotation marks omitted).
The jury in this case recommended the death penalty by a vote of eleven to one. The trial court found such a punishment was appropriate after considering all the evidence and properly weighing the aggravators against the mitigators. Specifically, the court found two aggravating factors,[9] one statutory mitigator,[10] and twenty-six nonstatutory mitigators.[11]
Upon review, we find that the circumstances of this case are similar to other cases in which we have upheld the death penalty. See Johnston v. State, 841 So.2d 349 (Fla.2002) (holding the death sentence proportional for sexual battery, beating, and strangulation of victim where aggravators included prior violent felony conviction and HAC); Orme v. State, 677 So.2d 258, 263 (Fla.1996) (holding the death sentence proportional for the sexual battery, beating, and strangulation of victim where aggravators included HAC, pecuniary gain, and sexual battery); Schwab v. State, 636 So.2d 3, 7 (Fla.1994) (holding the death sentence proportional for kidnaping, murder, and sexual battery of a boy where prior conviction of violent felony, murder in the course of a felony, and HAC were proven). Comparing the circumstances in this case to the cases cited above and other capital cases, we conclude that death is proportionate.

CONCLUSION
We affirm Johnston's first-degree murder conviction and death sentence.
It is so ordered.
*287 WELLS, PARIENTE, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, C.J., concurs in part and dissents in part with an opinion.
ANSTEAD, C.J., concurring in part and dissenting in part.
I agree completely with the majority opinion's discussion and resolution of all issues except for its discussion of the U.S. Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
NOTES
[1] Dr. Martin reached this conclusion based on the multiple deep bruising and fingertip contusions to the neck and the lack of petechial hemorrhages in and around the eyes. Petechial hemorrhages are sometimes seen in cases of strangulation where continuous pressure was applied.
[2] Pliego could not remember whether the encounter involved vaginal or oral intercourse.
[3] Testimony from other witnesses established that Johnston was in Nugent's house sometime before January 15, 1997.
[4] Williams v. State, 110 So.2d 654 (Fla. 1959); § 90.404, Fla. Stat. (Supp. 1996).
[5] The aggravating factors were: (1) defendant was previously convicted of a felony involving the use or threat of violence to the person, § 921.141(5)(b), Fla. Stat. (Supp.1996), and (2) the capital felony was especially heinous, atrocious, or cruel (HAC). § 921.141(5)(h), Fla. Stat.
[6] The only statutory mitigating factor was that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. § 921.141(6)(f), Fla. Stat.
[7] The nonstatutory mitigating factors were: (1) defendant has a long history of mental illness; (2) defendant suffers from a dissociative disorder; (3) defendant suffers from seizure disorder and blackouts; (4) defendant did not plan to commit the offense in advance; (5) defendant's acts are closer to that of a man-child than that of a hard-blooded killer; (6) defendant is haunted by poor impulse control; (7) defendant is capable of strong, loving relationships; (8) defendant excels in a prison environment; (9) defendant could work and contribute while in prison; (10) defendant has extraordinary musical skills; (11) defendant obtained additional education while he was in prison; (12) defendant served in the U.S. Air Force and was honorably discharged; (13) defendant received a certificate of recognition from the Secretary of Defense for services rendered; (14) defendant excelled and was recommended for early termination while on parole; (15) defendant was a productive member of society after his release from prison; (16) defendant turned himself in to the police; (17) defendant demonstrated appropriate courtroom behavior during trial; (18) defendant has tried to conform his behavior to normal time after time; (19) defendant has a special bond with children; (20) defendant has the support of his mother, brother, and sister; (21) defendant has been a good son, brother, and uncle; (22) defendant has a mother, sister, three brothers, three nieces, and two nephews who love him very much; (23) defendant maintained a Florida driver's license; (24) defendant maintained credit cards and a bank account; (25) defendant can be sentenced to multiple consecutive life sentences and will die in prison; (26) the totality of the circumstances does not set this murder apart from the norm of other murders.
[8] This is significant because Johnston maintained that he left the fingerprints, DNA, and possibly the shoe tracks when he was in Nugent's house approximately three weeks before the murder. The State relied on McCarthy's testimony to show that Johnston's fingerprints, DNA, and shoe tracks would not have remained undisturbed in Nugent's house for three weeks.
[9] See supra note 5.
[10] See supra note 6.
[11] See supra note 7.