# Third District Court of Appeal

## State of Florida

Opinion filed November 24, 2021.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D19-2371
Lower Tribunal No. F16-15265

_____

**Bryan Carlos Rodriguez,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Diane V. Ward, Judge.

Carlos J. Martinez, Public Defender, and James A. Odell, Assistant Public Defender, for appellant.

Ashley Moody, Attorney General, and David Llanes, Assistant Attorney General, for appellee.

Before EMAS, LOGUE and SCALES, JJ.

SCALES, J.

Bryan Rodriguez appeals his conviction for second-degree murder, claiming the trial court erred in denying his motion for judgment of acquittal. Based on the authority of Hodgkins v. State, 175 So. 3d 741 (Fla. 2015), we agree with Rodriguez that the State failed to present competent, substantial evidence at trial from which the jury could conclude, beyond a reasonable doubt, that Rodriguez committed the crime. We, therefore, reverse Rodriguez's conviction and remand to the lower court with directions to enter a judgment of acquittal on the charge. We certify to the Florida Supreme Court the question of great public importance of whether, in light of its recent decision in Bush v. State, 295 So. 3d 179, 201 (Fla. 2020), that portion of Hodgkins upon which we rely remains good law.

## I.  RELEVANT FACTS AND PROCEDURAL BACKGROUND

### A. The Victim's Death and the Initial Police Investigation

On Friday, May 29, 2013, Elsa Dominguez ("the victim") was found dead on the floor of her apartment bedroom, in a pool of blood, with a kitchen knife stuck in her throat. A broken drinking glass was found on the floor next to her body, and a fishtail was found on the kitchen counter. There was no sign of forced entry. Because the police readily found a letter from the victim stating how she wished her body to be handled upon her death, the police,

initially suspecting the wounds were self-inflicted, did not immediately suspect foul play.

The police permitted the victim's family to enter the victim's apartment and clean up the scene. The family members cleaned up the blood and threw the broken drinking glass away in a dumpster. At some point during the cleanup, the victim's family realized that the victim's purse, wallet, and cellphone were missing and notified the police. The police returned to the scene and retrieved the broken drinking glass from the dumpster.

While the victim's purse, wallet and cellphone were never located, in the eight-hour period following the victim's death, her cellphone pinged off a cellphone tower (tower 123) located approximately six to seven miles from the victim's apartment. For these eight hours, the cellphone remained stationary and pinged off the tower until either the phone battery was depleted or someone turned the phone off.

The victim's body was taken to the medical examiner for an autopsy, during which the victim's fingernail clippings were taken from both her hands. The knife was extracted from the victim's neck and sent to forensics, along with the fingernail clippings. Forensic analysis found no fingerprints on either the knife or the broken drinking glass. DNA analysis, however, revealed *at least* four contributors of DNA on a broken shard of the drinking glass and *at*

3

*least* three contributors of DNA on the victim's fingernail clippings. No DNA match was found in the criminal database. The case remained unsolved.

*B. The DNA Match and the Subsequent Police Investigation*

Three years later, a criminal database revealed that Bryan Rodriguez's DNA matched one of the DNA contributors found on the shard of the broken drinking glass, and one of the DNA contributors on the victim's fingernail clippings. The police then learned that Rodriguez's home was located within a quarter to one-half mile of the cellphone tower where the victim's cellphone had pinged for eight hours following the victim's death. With this information in hand, the police went to question Rodriguez.

Rodriguez told the police that he knew the victim well because the victim was his mother's godmother. Rodriguez's mother was also the niece of the victim's late husband. Rodriguez knew where the victim lived and had, on occasion, been to her apartment with other family members. Rodriguez denied ever visiting the victim alone.

Rodriguez told the police that he could not remember the last time he had seen the victim because "[i]t was a very long time ago." When, however, the police informed Rodriguez that his DNA had been found at the scene, Rodriguez speculated that his DNA must have been found because

4

Rodriguez had hugged the victim when he visited the victim's home prior to her death.

The police later arrested Rodriguez and the State charged him with the second-degree murder of the victim.[1]

*C. The Trial*

The State presented purely circumstantial evidence at the trial, positing no motive for the killing. The circumstantial evidence included:

• Testimony from a neighbor that the victim kept a very neat home, and that the victim washed her hands meticulously before preparing a meal.

• When the victim's body was found, there was a fishtail on the kitchen counter, suggesting that the victim had prepared food the day of her death.

• Rodriguez's DNA was found both on a shard of the broken drinking glass and on the victim's fingernail clippings.

• Markings on the victim's face were consistent with the assailant striking the victim with the assailant's left hand.

• Rodriguez is left-handed.

• The medical examiner testified that the victim was hit with a blunt object, asphyxiated by hand, and stabbed in the neck with a kitchen knife. The knife, which had an eight-inch blade, went through the victim's windpipe and through a vertebral artery.

• The medical examiner testified that the DNA found on the victim's fingernails was consistent with a struggle.

---

[1] The State did not charge Rodriguez with the theft of the victim's purse, wallet, and cellphone.

• The medical examiner testified that, while it was possible for foreign DNA to remain under a person's fingernails for hours, it was not likely in this case that any of the contributors' DNA had been on the victim's fingernails for long given that the victim kept a neat apartment and washed her hands frequently.

• The forensic examiner testified that the DNA found at the scene was "touch DNA."[2] Moreover, while touch DNA can transfer between people simply by their hugging and can also be transferred by touching a drinking glass, touch DNA was not likely to remain on a person's hands for twenty-four hours if the person washed his or her hands regularly.

• Rodriguez's home was located from a quarter to a half mile from cellphone tower 123 where the victim's cellphone had pinged following her death.

• Security logs from the victim's apartment complex contained no log entry for any visitors for the victim on Thursday, May 28, 2013, the day before the victim's body was found.[3]

Rodriguez asserted an alibi defense. Specifically, four of Rodriguez's family members – his mother, grandmother, aunt, and stepfather – all testified that they had gone with Rodriguez to the victim's home on Thursday, May 28, 2013, the day before the victim's body was found; that they all had something to drink at the victim's home before they left; and that Rodriguez

---

[2] The State's forensic expert testified that "touch DNA" is DNA that is transferred when a person comes in contact with a surface or another person through touch, such as by a handshake, a hug, rubbing or scratching.

[3] There is also no security log entry for any of the victim's family members who went to clean the victim's apartment following her death.

hugged the victim during the visit. When the visit concluded, the family members and Rodriguez all went to the same apartment – where all five family members lived – and Rodriguez never left their apartment.

At the conclusion of the evidence, defense counsel moved for a judgment of acquittal challenging the sufficiency of the State's evidence. The trial court denied the motion. The jury convicted Rodriguez, as charged, of second-degree murder. The trial court sentenced Rodriguez to life in prison. This appeal followed wherein Rodriguez argues the trial court erred by denying his motion for judgment of acquittal.

## II.　ANALYSIS

### A. This Court's Standard of Review

#### 1.　The current standard of review

When the defendant in a criminal appeal challenges the sufficiency of the State's evidence, the appellate court conducts a *de novo* review of the trial record to ensure that the guilty verdict is supported by competent, substantial evidence regarding each element of the charged crime. See Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002).[4] Because Rodriguez was

---

[4] "If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction." Pagan, 830 So. 2d 803. "The courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the

convicted of second-degree murder, consistent with that crime's elements as defined section 782.04(2) of the Florida Statutes (2013), we review the trial evidence to ensure that the State presented legally sufficient evidence[5] that: (i) the victim died; (ii) the victim's death was caused by the criminal act of Rodriguez; and (iii) the victim's unlawful killing was through act(s) imminently dangerous to another and demonstrating a depraved mind without regard for human life. If the State presented competent, substantial evidence regarding each of these three elements of the crime, we are compelled to affirm Rodriguez's conviction. Pagan, 830 So. 2d at 803. Only the second element is at issue here.

2. The Pre-*Bush* standard of review

Our appellate review of the State's evidence in this case would have included another component, *if* we were reviewing this case prior to the Florida Supreme Court's recent landmark decision in Bush v. State, 295 So.

---

jury may lawfully take of it favorable to the [State] can be sustained under the law." Lynch v. State, 293 So. 2d 44, 45 (Fla. 1974). In making this determination, the "credibility and probative force of conflicting testimony should not be determined." Id.

[5] "[T]he State may not rely on evidence presented in the defense's case to supply the missing elements necessary to prove its case." Span v. State, 732 So. 2d 1196, 1197 (Fla. 4th DCA 1999). Therefore, "we will only consider the evidence presented during the State's case-in-chief." M.M. v. State, 152 So. 3d 121, 124 (Fla. 3d DCA 2014).

3d 179, 201 (Fla. 2020). Because the State presented only purely circumstantial evidence of Rodriguez's guilt, our pre-Bush evidentiary review would not only have included competence and substantiality inquiries, but also an inquiry as to whether the State's evidence was "sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt." Johnston v. State, 863 So. 2d 271, 283 (Fla. 2003). Put another way, if we were reviewing the State's evidence pre-Bush, for us to affirm Rodriguez's conviction, the State's evidence would have to have been inconsistent with Rodriguez's reasonable hypothesis of innocence – i.e., his alibi defense. Id.

Our Supreme Court in Bush, though, eliminated this special standard of appellate review for purely circumstantial evidence cases. See Bush, 295 So. 3d at 200-01 ("The standard of review historically applied to a determination of the legal sufficiency of evidence to support a criminal conviction, at least where there is some direct evidence, is simply whether the State presented competent, substantial evidence to support the verdict. This standard should now be used in all cases where the sufficiency of the evidence is analyzed.") (citations omitted). Hence, post-Bush, our appellate review is limited to whether the State proved its case with competent, substantial evidence supporting each element of the charged crime. See

9

Bradwell v. State, 300 So. 3d 325, 327-28 (Fla. 1st DCA 2020), review denied, SC20-1337, 2021 WL 276149 (Fla. Jan. 27, 2021).

*B. Preservation*

As a threshold matter, the State argues that we cannot reach the merits of Rodriguez's sufficiency argument because he failed to preserve the argument at trial. See Young v. State, 141 So. 3d 161, 165 (Fla. 2013) ("[A] 'technical and pro-forma' motion which requests a judgment of acquittal without further argument is 'totally inadequate to preserve a sufficiency of the evidence claim for appellate review.'" (quoting Brooks v. State, 762 So. 2d 879, 895 (Fla. 2000))). To preserve his sufficiency issue for appellate review, Rodriguez was required, in moving for judgment of acquittal below, to identify the element(s) of second-degree murder for which he contended the evidence was lacking. See Bradwell, 300 So. 3d at 328. A boilerplate objection would not suffice. See Brooks, 762 So. 2d at 895; Fla. R. Crim. P. 3.380(b) (providing that a motion for judgment of acquittal "must fully set forth the grounds on which it is based").

The State claims that Rodriguez made only a boilerplate objection below and, therefore, waived appellate review of this issue. We disagree. When Rodriguez's counsel moved for a judgment of acquittal, counsel stated:

The objection at this time attend to any motion or objection of acquittal I ask the Court to take into account the evidence of – presented by the State, in the States [sic] face of their case as specifically ask to the fact that there's – From the date of the DNA expert testified how she testified which is consistent with the defense, that the Defendant was not there, and there is no evidence linking him to the scene, besides that DNA and ask the court to look at the entire evidence and consider it judge won't hold against the Defendant, even though you may be looking at it most favorable to the state [sic] at this point.

What appears to be inarticulate language by defense counsel, coupled with a poor transcription by the court reporter, makes the objection somewhat difficult to decipher. We conclude, however, that defense counsel adequately challenged the sufficiency of the evidence regarding second-degree murder's second element: i.e., whether Rodriguez caused the victim's death. Specifically, defense counsel argued to the trial court that acquittal was required because the only evidence connecting Rodriguez to this crime was the DNA evidence from the fingernail clippings and the broken glass, and that this was not enough to establish that Rodriguez had killed the victim. Thus, Rodriguez preserved this issue for appellate review. See Murray v. State, 3 So. 3d 1108, 1117 (Fla. 2009) ("While no magic words are needed to make a proper objection, the articulated concern must be 'sufficiently specific to inform the court of the perceived error.'" (quoting State v. Stephenson, 973 So. 2d 1259, 1262 (Fla. 5th DCA 2008))).

11

*C. The Legal Sufficiency of the Evidence Presented at Trial – the <u>Hodgkins</u> Case*

Having concluded that Rodriguez adequately preserved his sufficiency objection, we now address whether, in light of <u>Hodgkins v. State</u>, 175 So. 3d 741 (Fla. 2015), the State presented competent, substantial evidence that the victim's death was caused by Rodriguez's criminal conduct. Relying exclusively on this pre-<u>Bush</u> case, Rodriguez argues that the State failed to meet its burden.

    1. Did *<u>Hodgkins</u>* survive *<u>Bush</u>*?

Before we delve into <u>Hodgkins</u> and compare it to this case, though, we must address the State's argument that <u>Hodgkins</u> is no longer good law because it was overruled, *sub silencio*, by the Florida Supreme Court's <u>Bush</u> decision. <u>Hodgkins</u>, like <u>Bush</u> and this case, was a purely circumstantial evidence case in which the Florida Supreme Court applied the then-applicable special appellate review standard, and determined then that the State had failed to meet its burden of presenting evidence that was inconsistent with Hodgkins' reasonable hypothesis of innocence. See <u>Hodgkins</u>, 175 So. 3d at 749.

Not only did the <u>Hodgkins</u> court conclude that the State had failed to disprove Hodgkins' hypothesis of innocence, but the <u>Hodgkins</u> court *also*

determined that the State had not proven the elements of the crime with competent, substantial evidence:

> In this purely circumstantial case, we must determine *not only* whether the State has proven the "elements of the crime beyond a reasonable doubt," *but also* whether the record contains "competent evidence which is inconsistent with the defendant's theory of events." The analysis set forth above compels us to find that the State has failed to meet *these burdens.* We, therefore, conclude that the evidence before us is insufficient to sustain Derral Hodgkins' first-degree murder conviction.

Id. at 751 (emphasis added) (citations omitted).

Additionally, in the opinion's main text, the Court begins its analysis by discussing the sufficiency of the State's evidence, and then shifts its focus to the special standard analysis, preceding such analysis with the following sentence: "*Furthermore*, we find that the State's evidence is wholly consistent with Hodgkins' hypothesis of innocence that someone else killed (the victim)." Id. at 749 (emphasis added).

The State argues that, notwithstanding the plain dual holdings of the Hodgkins opinion as evidenced by the opinion's language and structure, the opinion's special appellate review analysis and its seemingly separate general sufficiency analysis are inextricably intertwined, so that neither holding survives Bush. The State suggests that because the State's evidence in Hodgkins was purely circumstantial, the Florida Supreme Court

necessarily applied the now-abandoned special appellate review standard throughout the entire opinion, so that it is impossible to meaningfully differentiate the two holdings, much less apply only one of the case's holdings to this case.

We are persuaded, however, that the Hodgkins opinion contains two discrete, albeit related, holdings, concluding that the State's evidence was insufficient to *both:* (i) establish Hodgkins' guilt beyond a reasonable doubt; *and* (ii) refute Hodgkins' reasonable hypothesis of innocence. We conclude that the Bush opinion overruled only that portion of Hodgkins relating to whether the State's evidence was sufficient to overcome Hodgkins' reasonable hypothesis of innocence, while leaving intact Hodgkins' conclusion that the evidence in that case was legally insufficient to prove Hodgkins' guilt beyond a reasonable doubt.[6]

### 2. Certification of *Hodgkins'* continued validity as a question of great public importance

---

[6] Our conclusion in this regard is bolstered by the Bush opinion not mentioning Hodgkins and our Supreme Court rarely overruling its precedent *sub silencio*. See Puryear v. State, 810 So. 2d 901, 905-06 (Fla. 2002) ("We take this opportunity to expressly state that this Court does not intentionally overrule itself sub silentio. Where a court encounters an express holding from this Court on a specific issue and a subsequent contrary dicta statement on the same specific issue, the court is to apply our express holding in the former decision until such time as this Court recedes from the express holding. Where this Court's decisions create this type of disharmony within the case law, the district courts may utilize their authority to certify a question of great public importance to grant this Court jurisdiction to settle the law.").

Because, as discussed below, our resolution of this appeal hinges – and, no doubt, other appellate courts' decisions will similarly hinge – on the continued validity of Hodgkins in this regard, we certify the following question to our Supreme Court as one of great public importance:

> Does Hodgkins' determination that the State failed to present competent, substantial evidence on which a jury could find, beyond a reasonable doubt, that Hodgkins killed the victim remain valid, notwithstanding the Florida Supreme Court's abandonment, in Bush, of the special standard of appellate review applied in purely circumstantial evidence cases?

### 3. The facts of *Hodgkins*

Having concluded that Hodgkins' general sufficiency holding survived Bush, we now compare the facts and circumstances of Hodgkins to the instant case. In Hodgkins, on September 28, 2006, the victim's body was found on the floor of her apartment bedroom. 175 So. 3d at 744. The victim had been beaten with a blunt instrument, strangled, and stabbed numerous times; the victim suffered three stab wounds to the neck that severed her jugular vein. Id. There was no sign of forced entry. Id. No murder weapon was ever recovered. Id. Twenty-one sets of fingerprints were lifted from the scene. Id. Three sets of fingerprints matched the victim, but the remainder was never identified. Id.

Over a year later, on November 1, 2007, the police received a report "indicating that a DNA profile type consistent with that of Hodgkins was detected underneath the fingernails of [the victim's] left hand." Id. The police then interviewed Hodgkins on two occasions, with Hodgkins giving multiple stories as to when he had last seen the victim. Id. at 745.

During the first police interview, Hodgkins stated that he had last seen the victim a month-and-a-half to two months prior to her death, at a convenience store. Id. In the second interview, when the police confronted Hodgkins with the fact that his DNA was found underneath the victim's fingernails, Hodgkins stated that the victim had scratched his back during a hug at the convenience store. Id. On further questioning, Hodgkins then admitted that he had also met the victim for sex two weeks after the convenience store encounter, only to then admit that he had lied, "this time stating that he had sex with [the victim] three days before she was killed and that [the victim] left six scratches on his back due to an orgasm." Id.

In addition to the DNA evidence, the State presented a myriad of circumstantial evidence at trial, including: (i) Hodgkins' inconsistent stories to the police, (ii) the victim, who worked as a cook and a dishwasher, cleaned her hands meticulously at home and at work; (iii) expert testimony that, based on the victim's handwashing habits, DNA would not remain under the

16

victim's fingernails for two or three days; and (iv) medical testimony that the victim had died due to "manual strangulation followed by sharp-force injuries." Id. at 747.

The jury convicted Hodgkins of premediated first-degree murder and Hodgkins was sentenced to death.

### 4. *Hodgkins'* relevant holding

As alluded to earlier, on direct appeal, the Florida Supreme Court reversed Hodgkins' conviction. The Court began its analysis by explaining that "[w]hen reduced to its core, the evidence connecting Hodgkins to the murder consists only of proof that his DNA was detected within scrapings collected from [the victim's] left fingernails." Id. at 748. The Court went on observe that "this [DNA] evidence does not show that the sample in which Hodgkins' DNA was embedded was anything more than scrapings of dirt, oil or other debris that naturally accumulates under the nail." Id. Next, noting that Hodgkins had made no admissions concerning the murder and that there was no evidence to suggest that Hodgkins had a motive for killing the victim, the Court determined "[i]n this circumstantial case, the State simply has not pointed to legally sufficient evidence establishing a nexus between Hodgkins' DNA and any criminal conduct on his part." Id. at 749.

### 5. Applying Hodgkins to this case

17

We conclude that Hodgkins compels us to reverse Rodriguez's second-degree murder conviction. It is inescapable that the quantum and quality of the evidence presented by the State that Rodriguez killed the victim is strikingly similar to the evidenced presented by the State in Hodgkins. Among other things, these similarities include: the victims' manner of death, the meticulous hygiene habits of the victims, each case's dearth of physical evidence, and each case's lack of motive. The most important similarity in the two cases is that the only evidence connecting the defendants to the murders is DNA detected at the scene. Indeed, the only evidence in this case that Rodriguez killed the victim consisted of Rodriguez's DNA on the victim's fingernails and on a broken shard of the drinking glass found next to the victim's body.

As in Hodgkins, the nature of the DNA recovered at the victim's apartment is relatively mundane because it did not come from blood, other bodily fluids, or skin tissue.[7] Id. at 748. Rather, expert testimony confirmed that Rodriguez's DNA found at the scene was of the type that is commonly transferred through innocuous circumstances by simple touch. Rodriguez's DNA was also one of *at least* four DNA contributors on the drinking glass,

---

[7] Unlike Hodgkins, Rodriguez's DNA was not scraped from underneath the victim's fingernails but came from fingernail clippings.

18

and one of *at least* three DNA contributors on the victim's fingernail clippings. It is, therefore, worth noting that DNA from these other contributors existed despite the victim's meticulous cleaning and handwashing habits.

For these reasons, we similarly conclude, as did our Supreme Court in Hodgkins, that the State did not present legally sufficient evidence establishing a nexus between Rodriguez's DNA and any criminal conduct on his part. In short, if the State's evidence in Hodgkins was legally insufficient to establish that Hodgkins killed the victim, the State's evidence in this case is similarly deficient.

### 6. Additional factors not present in *Hodgkins*

While the State's principal argument in this appeal is that, in light of Bush, Hodgkins no longer remains good law, the State does try to distinguish Hodgkins from this case by relying upon facts in this case that were not present in Hodgkins. In particular, the State points out that: (i) following the victim's death, the victim's cellphone pinged from cellphone tower 123 that was located one quarter to one half mile from Rodriguez's apartment; and (ii) the medical examiner testified that the markings on the victim's face were consistent with the victim being struck by the assailant with the assailant's left hand, and Rodriguez is left-handed. As discussed below, though, these additional facts do not sufficiently distinguish this case from Hodgkins.

19

As to the victim's cellphone, it was never found at all, much less in Rodriguez's possession or even at Rodriguez's home. The cellphone carrier's records custodian testified at trial that the pinging to tower 123 occurred whenever someone made an incoming call to the cellphone that went unanswered. While the pinging indicated that the cellphone was located somewhere within a narrow range of tower 123 at the moment the incoming call was made, the precise location of the cellphone, and who possessed it, could not be determined. Indeed, the cellphone could be located anywhere within the narrow range of the cellphone tower. That range included not only Rodriguez's apartment but also many other apartment residences and a portion of the northbound and southbound lanes of the Florida Turnpike, near the Florida International University main campus. As argued by defense counsel during closing argument, the victim's cellphone could have been discarded on the side of the Turnpike, where it sat and pinged off the cellphone tower until the cellphone battery died.[8] This evidence does not sufficiently distinguish this case from Hodgkins.

---

[8] During cross-examination, the record's custodian testified as follows:

Q. So let's – for discussion purposes, if the phone is in a vehicle and is driving south to the Florida Keys, and it – at that moment in time, somebody makes a call and it goes to voice mail, it will hit that tower 123?

We similarly conclude that the medical examiner's testimony that the victim's injuries were consistent with a left-handed assailant does not sufficiently distinguish this case from <u>Hodgkins</u>. It is understood that one need not be left-handed to strike someone with his or her left hand. Indeed, on cross-examination, the medical examiner conceded that she could not conclude whether the attacker was right-handed or left-handed. Moreover, beyond establishing that Rodriguez was left-handed, the State made no attempt to establish the percentage of males that are left-handed in Miami-Dade County or in any population center.

Quite simply, the entirety of the evidence presented below was not substantial, competent evidence to establish that Rodriguez killed the victim, an essential element of second-degree murder.

## III.    CONCLUSION

To convict Rodriguez of second-degree murder the State shouldered the burden of presenting legally sufficient evidence that the victim's death was caused by Rodriguez's criminal conduct. Viewing the evidence in the

---

A. Yeah. If that – they were on that side of the tower, then yes. That's a high possibility.

Q. Likewise, if they were going northbound?

A. That is correct.

21

light most favorable to the State, and following the Florida Supreme Court's decision in Hodgkins, we conclude the State failed to meet its burden. Because the State failed to introduce competent, substantial evidence below from which the jury could find, beyond a reasonable doubt, that Rodriguez killed the victim, we reverse and remand this case with directions for the trial court to enter a judgment of acquittal on the charge of second-degree murder. We also certify a question of great public importance to the Florida Supreme Court as to the continued validity of Hodgkins in light of Bush.

Reversed and remanded with instructions; question certified.

LOGUE, J., concurring.

I fully concur in the majority opinion. I only write to state my understanding of what part of Hodgkins v. State, 175 So. 3d 741 (Fla. 2015), survived Bush v. State, 295 So. 3d 179 (Fla. 2020). One of the rationales for the reversal of the conviction in Hodgkins was Florida's "special appellate standard" for review of convictions in circumstantial evidence cases. That standard required the reviewing court to find that the evidence was inconsistent with the defendant's reasonable theory of events. Hodgkins, 175 So. 3d at 749–51. Obviously, this rationale did not survive elimination of that special appellate standard in Bush. 295 So. 3d at 199–201.

In Hodgkins, however, prior to discussing the special appellate standard, the Supreme Court first concluded: "the State simply has not pointed to legally sufficient evidence establishing a nexus between Hodgkins' DNA and any criminal conduct on his part." 175 So. 3d at 749. In other words, circumstances exist where DNA evidence that merely places a defendant at a location is not sufficient, without more, to support an inference beyond a reasonable doubt that the defendant committed a crime that occurred at that location. I think this commonsense aspect of the rationale of Hodgkins was the law before Hodgkins and remains good law. See McDuffie

23

v. State, 970 So. 2d 312, 330 (Fla. 2007) ("Although McDuffie's DNA was found on a Pepsi bottle sitting on a box that also bore a spot of Schneider's blood, no evidence indicated when the bottle was placed there, and the fact that McDuffie worked in the store all week militates against that DNA on the Pepsi bottle being probative of these crimes.").[9]

Here, the State produced no evidence reasonably tending to indicate that Rodriguez's DNA at the crime scene evinced anything more than the fact that he was present there at some point before the crime occurred. The State's argument that, due to the victim's cleanliness, Rodriguez's DNA could only have been deposited during an attack on the victim is supported by less direct evidence than was adduced in Hodgkins and, more importantly, is contradicted by the fact that Rodriguez's DNA was one of a mixture of at least three contributors on the victim's fingernails, and at least four contributors on the broken drinking glass found near the victim. The majority opinion fully and ably explains why the State's other evidence at trial

---

[9] Of course, circumstances exist where DNA evidence placing a defendant at a crime scene does provide the nexus to criminal activity, for example: (a) DNA from a defendant who would not normally have access to the crime scene, Johnston v. State, 863 So. 2d 271, 284 (Fla. 2003); (b) DNA on the murder weapon, Truehill v. State, 211 So. 3d 930, 953 (Fla. 2017); (c) DNA indicating sexual contact or battery, Darling v. State, 808 So. 2d 145, 157 (Fla. 2002); or (d) DNA indicating a struggle, Reynolds v. State, 934 So. 2d 1128, 1136–37, 1147 (Fla. 2006).

was too equivocal and attenuated to provide the nexus to the criminal act missing from the DNA evidence in this case.