PER CURIAM.
This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Because we find that the record lacks competent, substantial evidence to sustain the conviction, we reverse and vacate Hodgkins’ conviction and sentence.
FACTS AND PROCEDURAL HISTORY
Derral Hodgkins was convicted of the first-degree murder of Teresa Lodge. The record reflects that in September 2006, Lodge lived alone, in a first-floor unit at the Lakeside Apartments complex of Land O’Lakes, Pasco County, Florida. At that time, she worked primarily as a cook, manager, and dishwasher at Frank’s Café, a breakfast restaurant that was located in a strip mall directly across the street from her apartment. Lodge typically worked at Frank’s Café from 6 a.m. to approximately 2 p.m. on weekdays.
During the week of her death, Lodge worked full shifts at the restaurant on Monday and Tuesday, September 25 and 26, 2006. Around 10 p.m. on that Monday, Melanie Zakel visited Lodge at home. The two spent the evening talking, joking, and cleaning Lodge’s apartment until approximately 2 or 3 a.m. on Tuesday morning. At some point that evening, Hodg-kins visited the apartment. Zakel testified that Lodge’s voice became uneasy as Lodge and Hodgkins conversed at the front door, but that at no point did Hodg-kins enter the apartment or make contact with Lodge. Hodgkins stayed for approximately five minutes, and that was the first and last time before trial that Zakel saw him. According to Zakel, Lodge appeared aggravated after Hodgkins left. Zakel left the apartment around 4:30 a.m. because Lodge needed to shower and get ready for work. ' ■
Lodge worked a partial shift at Frank’s Café on Wednesday, September 27, 2006. She spent most of the morning training a new employee on the procedures for cooking the food and running and cleaning the restaurant. Lodge left work between 9 and 10 a.m. to attend a doctor’s appointment. She. later called the restaurant at *744 2:28 p.m., and that was the last time anyone from the restaurant spoke with Lodge.
On Thursday, September 28, 2006, Leslie Thomas, Lodge’s coworker, attempted to pick up Lodge for work. Thomas called Lodge’s cell phone around 5:30 a.m. and, upon arriving at the apartment, knocked on the door as well as the bedroom and bathroom windows, but Lodge did hot answer. The door was lockéd, but Thomas noticed that both the light and television in the bedroom were on. Thomas eventually left to open Frank’s Café.
Other people subsequently stopped by Lodge’s apartment to check on • her but could not open the door. The State presented testimony that a spare key to the apartment that was usually hidden outside was missing prior to these events. Having not heard from Lodge, Thomas called Dawn Williams around noon and instructed her to check on Lodge because Williams had another spare key to the apartment.[1]
At approximately 1 p.m., Williams summoned law enforcement’to Lodge’s apartment, and Sergeant Larry Engle of the Pasco County Sheriff’s Office (PCSO) responded to the scene. Upon entering the apartment using Williams’ spare key, En-gle found Lodge’s body in the bedroom near the foot of the bed lying face up on the floor. Lodge’s skin was discolored; her body had multiple injuries, including a large, gaping wound on her neck; a pool of dried blood surrounded her head; and there was blood on her face, shirt, and mouth. There also were eyeglasses adjacent to Lodge’s body, multiple twenty-dollar bills underneath her body and the bed, and a large quantity of cash in a purse sitting on the bed. Engle testified that the apartment was. orderly and well-kept, and that there were no signs of forced entry.
Responding forensic investigators collected, among other things, scrapings from underneath Lodge’s fingernails as well as her fingernail clippings. They also collected from the kitchen a beer bottle bearing what was later identified as Lodge’s blood. Additionally, twenty-one sets of fingerprints were lifted from the crime scene, three of which belonged to Lodge; the remainder were unidentified. No murder weapon was recovered.
An autopsy of Lodge’s body was performed on September 29, 2006. According to medical expert testimony, Lodge suffered thirty-two bodily injuries during the commission of the crime. Lodge’s death was ruled .a homicide caused by sharp-force injuries, including seven stab wounds to the torso and abdomen and, three incised wounds to the neck resulting in the severance of the external jugular vein. Medical expert testimony also indicated that manual strangulation was a contributing factor of Lodge’s death. No injuries were found on her hands or arms, indicating a lack of defensive wounds.
On or about November 1, 2007, the Florida Department of Law Enforcement (FDLE) submitted 'a report to PCSO Detective Melbome Eckley, indicating that a DNA profile type consistent with that of Hodgkins was detected underneath the fingernails of Lodge’s left hand. On November 6, Eckley and his partner, Detective Steve Foshey, obtained Hodgkins’ consent to interview him in the living room of his house. Based on the transcript of the interview, which was recorded, Hodgkins told Eckley and Foshey that he and Lodge dated sometime between 1985 and 1987. Hodgkins said that in 2004, he. visited Lodge at her Lakeside apartment and, at *745 that time, Lodge told- him that she was dealing cocaine and did not want him to be involved if she were arrested for it. Hodg-kins also told Eckley and Foshey that he had not gone back to Lodge’s apartment since then, and that the last time he saw Lodge was a month-and-a-half to two months prior to her death. Hodgkins explained that he and Lodge encountered one another at a Circle K convenience store down the street from Lodge’s apartment, and that they hugged and kissed before parting ways.
One week later, Eckley and Foshey conducted a second recorded interview with Hodgkins, again in his living room. After Eckley confronted Hodgkins with the FDLE report concerning Hodgkins’ DNA, Hodgkins explained that his DNA was under the fingernails because Lodge would scratch his back whenever they hugged-Hodgkins further explained that Lodge scratched his back when they last saw each other and hugged at the convenience store a month-and-a-half before the murder. Hodgkins initially told Eckley and Foshey that the last time he and Lodge engaged in sexual intercourse was in the late 1980s when they dated. Hodgkins later admitted that he lied, explaining that he and Lodge had sex two other times, and that Lodge scratched his back during one of those times. Hodgkins first indicated that the second sexual rendezvous occurred around the time of the Circle K encounter — a month-and-a-half before the murder — but then changed the timeframe to two weeks after that encounter — sometime in August. Upon further questioning, Hodgkins again admitted that he lied, this time stating that he had sex with Lodge three days before she was killed, and that Lodge left six scratches on his back due to an orgasm. Hodgkins also explained, that he lied because he did not want his then-wife to learn of his infidelity. Hodgkins also reasoned that, because he made., contact with Lodge so close to her death, he did not want detectives accusing him of murder. Despite the detectives’ repeated insistence, Hodgkins denied killing Lodge.
Hodgkins was arrested on November 18, 2007, and charged with the premeditated first-degree murder of Lodge. During the August 2011 trial,[2] after the State closed its case, the court denied the defense’s motion for a judgment of acquittal for failure to present evidence inconsistent with the theory that Hodgkins’ DNA was deposited underneath Lodge’s fingernails several days before her death and remained there until it was collected. Subsequently, the jury returned a verdict finding Hodgkins guilty as charged and, following the penalty phase and Spencer[3] hearing, the court imposed a sentence of death.
This appeal follows.[4] Because we conclude that the State failed to introduce competent, substantial proof that Hodg-kins killed Lodge, we-limit the following discussion to the sufficiency of the evidence. .
STANDARD OF REVIEW
In every capital case involving the imposition of the death penalty, this *746 Court independently reviews the record to ensure there is legally sufficient evidence to sustain the conviction. Dausch v. State, 141 So.3d 513, 517 (Fla.2014). There is sufficient evidence to sustain a conviction “if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt.” Johnston v. State, 863 So.2d 271, 283 (Fla.2003) (citing Banks v. State, 732 So.2d 1065 (Fla.1999)).
However, purely circumstantial cases, such as this one, are reviewed differently:
A special standard of review of the sufficiency of the evidence applies where a conviction is wholly based on circumstantial evidence. Jaramillo v. State, 417 So.2d 257 (Fla.1982). Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. McArthur v. State, 351 So.2d 972 (Fla.1977); Mayo v. State, 71 So.2d 899 (Fla.1954). The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse. Heiney v. State, 447 So.2d 210 (Fla.), cert. denied, 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984); Rose v. State, 425 So.2d 521 (Fla.1982), cert. denied, 461 U.S. 909, 103 S.Ct. 1883, 76 L.Ed.2d 812 (1983), disapproved on other grounds, Williams v. State, 488 So.2d 62 (Fla.1986).
Thorp v. State, 777 So.2d 385, 389 (Fla.2000) (quoting State v. Law, 559 So.2d 187 (Fla.1989)). Further,
[i]n meeting its burden, the State is not required to “rebut conclusively, every possible variation of events” which could be inferred from the evidence, but must introduce competent evidence which is inconsistent with the defendant’s theory of events. Darling [v. State, 808 So.2d 145, 156 (Fla.) ] (quoting Law, 559 So.2d at 189). Once the State meets this threshold burden, it becomes the jury’s duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt. Id.
Johnston, 863 So.2d at 283. We reiterate, however, that “[a]lthough the jury is the trier of fact, a conviction of guilt must be reversed on appeal if it is not supported by competent, substantial evidence.” Lindsey v. State, 14 So.3d 211, 215 (Fla.2009) (quoting Ballard v. State, 923 So.2d 475, 482 (Fla.2006)) (internal quotation marks omitted).
Finally, this Court has instructed that “[suspicions alone cannot satisfy the State’s burden of proving guilt beyond a reasonable doubt[.]” Ballard, 923 So.2d at 482. In fact, we have held that “even a ‘deep suspicion the appellant committed the crime charged is not sufficient to sustain [a] conviction.’ ” Lindsey, 14 So.3d at 216 (quoting Williams v. State, 143 So.2d 484, 488 (Fla.1962)).
Evidence which furnishes nothing stronger than a suspicion, even though it would tend to justify the suspicion that the defendant committed the crime, [ ] is not sufficient to sustain [a] conviction. It is the actual exclusion of the hypothesis of innocence which clothes circumstantial evidence with the force of proof sufficient to convict. Circumstantial evidence which leaves uncertain several hypotheses, any one of which may be sound and some of which may be entirely consistent with innocence, is not adequate to sustain a verdict of guilt. Even though the circumstantial evidence *747 is sufficient to suggest a probability of guilt, it is not thereby adequate to support a conviction if it is likewise consistent with a reasonable hypothesis of innocence.
Dausch, 141 So.3d at 518 (quoting Ballard, 923 So.2d at 482) (alterations in original).
We have reversed first-degree murder convictions even where the State’s circumstantial case involved more forensic evidence than that introduced at Hodgkins’ trial. Ballard, in particular, involved two neighbors and long-time friends of Ballard who were found robbed and beaten to death in their apartment. The evidence of guilt consisted of Ballard’s fingerprint on the bedframe near the body of one of the victims, and a hair found on the victim’s hand that was consistent with Ballard’s telogen-phase arm hair. Ballard, 923 So.2d at 483. In concluding this evidence was insufficient to sustain Ballard’s convictions, we noted the lack of direct evidence showing when the hair and print were left or how they came to be left in their locations. Id. We further determined that, while “prov[ing] that Ballard was in [the victims’] apartment at some point in time,” the State’s evidence “did not refute the possibility of his prior innocent presence in the bedroom as accounting for the hair and print.” Id. at 484. Additionally, the following circumstances were important to our determination: there were no eyewitnesses to the crime; the murder weapon was never recovered; none of the other recovered fingerprints were identified as Ballard’s; the State presented no evidence of Ballard having hatred or ill feelings towards the victims; nor was there any evidence that Ballard had any interest in robbing the victims; Ballard made no admissions about the crimes; and no one testified about any suspicious conduct on his part. Id. at 484-85. Accordingly, we reversed Ballard’s convictions, vacated his death sentences, and remanded for the entry of a judgment of acquittal. Id. at 486.
As the circumstances in Ballard are substantially similar to those found in this case, we again conclude “that the State’s evidence, while perhaps sufficient to create some suspicion, is simply not strong enough to support a conviction.” See id. at 483 (citing Jaramillo, 417 So.2d 257).
THIS CASE
To prove first-degree premeditated murder, the State was required to establish that: (1) the victim, Lodge, is dead; (2) Lodge’s death was premeditated; and (3) Lodge’s death resulted from the criminal act of the defendant, Hodgkins. See Dausch, 141 So.3d at 517 (citing Fla. Std. Jury Instr. (Crim.) 7.2).
At trial, the State’s entire circumstantial case encompassed the following evidence: (1) statements from Hodgkins wherein he lied to detectives about his last time seeing and engaging in sexual intercourse with Lodge; (2) medical testimony explaining the manner of death, including manual strangulation followed by sharp-force injuries; (3) Lodge’s cleaning habits at home and at work, including washing her hands and nails for three minutes each time; (4) observations of Lodge’s cleaning and handling raw foods at Frank’s Café on Monday, Tuesday, and Wednesday the week of her death; (5) DNA material found underneath Lodge’s fingernails matching Hodg-kins’ DNA; and (6) expert testimony that the DNA material was robust when collected, it would have significantly degraded since the Monday before Lodge’s death, and based on Lodge’s hygienic activities and factors likely to degrade DNA material, the foreign DNA found underneath Lodge’s fingernails on that Thursday would not have been “under there for one, two, or three days[.]” While this evidence *748 may serve to establish that Hodgkins made contact with Lodge at some point before her death, it fails to prove he killed Lodge.
When reduced to its core, the evidence connecting Hodgkins to the murder consists only of proof that his DNA was detected within scrapings collected from Lodge’s left fingernails. See Jaramillo, 417 So.2d at 257 (“Proof that Jaramillo’s fingerprints were found on certain items in the murder victims’ home was the only evidence offered by the State to show that Jaramillo was involved in these murders.”). However, the State presented no direct evidence of how the DNA came about being in its location. See Ballard, 923 So.2d at 483. Rather, in theorizing that Hodg-kins’ DNA was transferred when Lodge scratched him during strangulation, during oral arguments the State hesitantly described the sample removed from Lodge’s fingernails as being bloody skin cells. This was a mischaracterization of the evidence.
First, whether we assume the supposed skin cells were covered by either Lodge’s blood or Hodgkins’ blood, nothing in the record indicates that any blood was detected on the sample collected from Lodge’s left fingernails. More to this point, the State presented no evidence showing that Hodgkins’ blood was found anywhere oh Lodge’s body or in her apartment. Secondly, the State’s expert witness described the DNA itself as being “robust,” meaning there was “a considerable amount of DNA present that [was] completely intact” and not significantly degraded for purposes of developing a complete profile. In other words, it was “high-level DNA.” The expert further agreed that the actual 'sample collected from Lodge’s left fingernails was not “a big chunk of skin[.]” Rather, it was visible pieces of “material ] that look[ed] consistent with something scraped out from under [one’s] fingernails.” Interpreting this description in a light favorable to the State, this evidence does not show that the sample in which Hodgkins’ DNA was embedded was anything more than scrapings of dirt, oil or other debris that naturally accumulates under the nail. And, as expounded upon below, the record evidence equally generates the theory that Hodgkins’ DNA was transferred to Lodge through innocent contact.
In addition, similarly to Ballard, the record shows that eighteen unidentified fingerprints were lifted from the crime scene, but none belonged to' Hodgkins. See id. at 484 (“[W]hile there was one hair identified as Ballard’s from Jones’ hand, there were other hairs not traced to Ballard on the hand, and literally hundreds of other unidentified hairs at the scene that were never DNA-tested.”). The State’s medical expert also testified that, of her thirty-two bodily injuries, Lodge had' abrasions on her face that were consistent with blunt trauma from a fist or bottle. The record reflects that a beer bottle bearing her blood was recovered from the crime scene. Viewing this evidence favorably to the State, we find that the assailant likely used, -at least, that beer bottle to beat Lodge’s face. But, the State presented no direct evidence of Hodgkins’ fingerprints being on the bottle or, much less, that any additional measures were taken to establish a link between the bottle and whomever used it as a weapon. In fact, there is no evidence in this record that the murder weapon was recovered. See id. at 485 (“The murder weapon was never discovered, and, although the curl bar and weight found at the scene had bloody-fingerprints, none of them were identified as Ballard’s.”).
Also like Ballard, no eyewitnesses placed Hodgkins in' or around Lodge’s apartment at the time of the murder. *749 Other than lying about the last time he and Lodge engaged in -sexual intercourse and stating that he did not want his wife to learn about his infidelity, Hodgkins made no admissions concerning- the murder. Likewise, the only indication in this record concerning Hodgkins’ interest in killing Lodge includes the interrogating detectives’ repeated insistence that Hodgkins became upset when Lodge finally decided not to comply with his sexual advances. We have not encountered any evidence in the record concerning, for instance, Hodg-kins’ animosity towards Lodge to substantiate this theory. Although direct testimony shows that, on the evening of Monday, September 27, Lodge appeared aggravated after conversing with Hodgkins at her apartment door for five minutes, no evidence was introduced corroborating the substance of the conversation or' confirming that the conversation later incited Hodgkins to kill Lodge. And, we refuse to surmise that Lodge’s manifested demeanor somehow denotes Hodgkins’ criminal intent towards her. See id. at 482 (reiterating that “the circumstantial evidence test 'guards against basing a conviction on im-permissibly stacked inferences” (quoting Miller v. State, 770 So.2d 1144, 1149 (Fla.2000)) (internal quotation marks omitted)). If anything, it merely demonstrates Lodge’s ill feelings towards Hodgkins at that moment — not necessarily the inverse. Nevertheless, Hodgkins’ admissions that he and Lodge used to date in the late eighties, remained friends since then, and were sexually active as recent as the Monday [5] before the murder belies the notion that Hodgkins harbored any hatred towards Lodge. See id. at 484-85.
This is not a case like Washington v. State, 653 So.2d 362 (Fla.1994), where the first-degree murder conviction was supported by not only forensic evidence from the crime scene, but also evidence of the defendant’s possession and selling of the victim’s belongings after the murder, and records establishing his proximity to the crime scene around the time of the murder. Id. at 366. Nor are the circumstances here reminiscent of Thorp, 777 So.2d at 390, where, in addition to DNA evidence, the State introduced direct evidence linking the defendant to the first-degree -murder of a prostitute in a park, including the defendant’s admissions to his cellmate, and observations from the night in question of blood on his .clothing and injuries consistent with a physical struggle. In this circumstantial case, the State simply has not pointed to legally sufficient evidence establishing a nexus bétwéen Hodgkins’ DNA and any criminal conduct on his part.
Furthermore, we find that the State’s evidence is wholly consistent with Hodg-kins’ hypothesis of innocence, that someone else killed Lodge. Preliminarily, we conclude that the timeframe within which Lodge could have been killed was far too lengthy to reasonably infer that only Hodgkins made contact with Lodge. The record , reflects that. Lodge worked at Frank’s Café the morning of Wednesday, September 27, but left around 10 a.m. to attend a doctor’s appointment. The State presented testimony and phone records showing that she called the restaurant that day at 2:23 p.m. — which' establishes she was still alive. However, the State did not introduce any other evidence concerning Lodge’s activity following the -phone call. Nor was there any evidence of Hodgkins’ activity or whereabouts ■ that day.' Addi *750 tionally, Leslie Thomas, Lodge’s coworker, testified that she attempted to pick up Lodge for work on Thursday, September 28. Thomas testified that Lodge did not answer her 5:30 a.m. phone call or respond when she knocked on the apartment door and bathroom and bedroom windows fifteen minutes later. Thomas recalled that the front door was locked, but that both the light and television in the bedroom were on. PSCO Sergent Larry Engle testified that when he arrived at the apartment at 1 p.m. that afternoon, Lodge was dead and her head was lying in a pool of dried blood. The fact that the blood was dry, Engle explained, indicated that the murder did not occur immediately before he found Lodge.
These circumstances evince that Lodge was murdered between approximately 2:30 p.m. that Wednesday and 5:30 a.m. the following day — a fifteen-hour window. Cf. Washington, 653 So.2d at 363, 366 (evidence introduced in support of first-degree murder conviction established that victim was killed in her home within a four-hour window, and that defendant was imprisoned at a work release center about two miles from victim’s home but, on the day of the murder, was absent from the center for over three continuous hours within that four-hour window).
Next, the State highlights its expert witness’s testimony for support that Hodg-kins was the last person to make contact with Lodge, and that such contact was contemporaneous with the murder. Crime laboratory analyst Lisa Thoomas testified that in the DNA mixture collected from Lodge’s left fingernail scrapings, she detected no foreign profile other than that consistent with Hodgkins’. She acknowledged that “one explanation” for this finding was that Hodgkins was the last person to come into contact with Lodge before she died. However, she could not definitively rule out other explanations for this finding.
Moreover, Thoomas testified that a complete profile could not be created from foreign DNA found on Lodge’s left fingernail clippings, but that a male indicator was detected. Thoomas agreed on cross-examination that cellular material could transfer from one person to another’s fingernails through constant, everyday contact, such as hand-shaking or sexual intercourse. Based on Hodgkins’ recorded interviews, he and Lodge always hugged and kissed before departing from encounters with one another. Particularly while hugging, Lodge would put her hands under Hodgkins’ shirt and lightly rake his back with her fingernails. According to Hodgkins, on several occasions before the day of the murder, the two engaged in consensual intercourse in Lodge’s apartment. Finally, as previously discussed, the State presented no evidence showing that Hodgkins left any of the eighteen unidentified fingerprints, or that his fingerprints were on the beer bottle with which Lodge likely was beaten.
This evidence leaves unrefuted the possibility that Hodgkins was merely one of the last persons to make contact with Lodge but the only one to leave detectable forensic evidence. In other words, the State’s evidence is equally susceptible to the theory that, after Hodgkins made innocent contact with Lodge, the perpetrator then killed her but left either no detectable forensic evidence or no evidence at all at the crime scene. This is true regardless of whether Hodgkins encountered Lodge at her apartment or out in public, and likewise whether they embraced each other with a friendly hug or engaged in sexual intercourse. See Jaramillo, 417 So.2d at 257 (“The State failed to establish that Jaramillo’s fingerprints could only have *751 been placed on the items at the time the murder was committed.”); see also Miller v. State, 107 So.3d 498, 501-02 (Fla. 2d DCA 2013) (“Th[e] [State’s] theory, however, ignores the State’s own evidence that someone could have touched the gun after the ‘major contributor’ and simply left no detectable DNA. Moreover, the State’s expert clearly testified that there was no way to determine from the mere presence of DNA on the gun when it was deposited.”).
This theory is bolstered by evidence that: (1) a spare key to Lodge’s apartment that was hidden outside was missing on the day of the murder and has yet to be recovered; (2) there were no signs of forced entry in the apartment; (3) Lodge lived directly across the street from Frank’s Café and several coworkers had been inside her apartment on numerous occasions; (4) Lodge sometimes hosted parties and cookouts at her apartment; (5) she dealt drugs to various people out of her apartment; and (6) her drug dealer and ex-husband used to beat her. We find this evidence to be consistent with the possibility that anyone who knew the hidden location of the spare key could have used it to gain access to Lodge’s apartment and kill her. In fact, the evidence, and especially the lack of forced entry into the apartment, generates the theory that the unidentified assailant was invited into the apartment with Lodge’s consent, killed her, and then locked the apartment on the way out using the spare key.
CONCLUSION
In this purely circumstantial case, we must determine not only whether the State has proven the “elements- of the crime beyond a reasonable doubt,” but also whether the record contains “competent evidence which is inconsistent with the defendant’s theory of events.” Johnston, 863 So.2d at 283 (quoting Darling, 808 So.2d at 156). The analysis set forth above compels us to find that the State has failed to meet these burdens. We, therefore, conclude that the evidence before us is insufficient to sustain Derral Hodgkins’ first-degree murder conviction. Accordingly, we reverse and vacate the conviction and sentence of death, and remand with directions that a judgment of acquittal be entered.
It is so ordered.
LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, and PERRY, JJ., concur.
LABARGA, C. J., concurs with an opinion, in which PARIENTE, J., concurs.
CANADY, J., dissents with an opinion.

. Williams passed away before trial and, therefore, was unavailable to testify.

. Hodgkins was initially tried in January 2011, which ended in a mistrial.

.’ Spencer v. State, 615 So.2d 688 (Fla.1993).

. On appeal, Hodgkins raises five issues: whether (1) the State proved Hodgkins committed the murder; (2) the State proved premeditation; (3) the trial court -erred by limiting cross-examination of a prosecution witness regarding a pending criminal charge; (4) the trial court erred by ordering that Hodgkins remain in visiblé; physical restraints during the penalty phase; and (5) Florida's capital sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

. During his second .interview with PCSO, Hodgkins indicated that he last had sex with Lodge “three days before her death.” While this timeframe is uncleár from the record, yiewing the evidence in a light favorable to the State, it appears Hodgkins meant he engaged in sexual intercourse with Lodge sometime on Monday, September 25, 2006.