# Supreme Court of Florida

_____

No. SC14-2410
_____

**RALPH DANIEL WRIGHT, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[May 11, 2017]

PER CURIAM.

Ralph Daniel Wright, Jr., appeals his convictions for two counts of first-degree murder and his two death sentences. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Because we conclude that the evidence presented at trial is insufficient to sustain the convictions, we reverse Wright's convictions and vacate his sentences.

## I. BACKGROUND

Paula O'Conner met Ralph ("Ron") Wright, Jr., on a dating website in 2003. At the time, Paula lived in St. Petersburg with her teenage daughter, Tori. Wright was a sergeant on active duty in the United States Air Force and stationed at

MacDill Air Force Base in Tampa. Wright was married but told Paula he was divorced. The two began dating and were shopping for engagement rings by the end of 2004. During their relationship, Wright often spent the night at Paula's house but, at times, he would disappear for long periods, telling Paula that he went on "secret missions" for the Air Force.

In July 2005, Paula became pregnant with Wright's son. Over the course of the pregnancy, Wright began to see Paula less and less. While pregnant, Paula learned that her baby had brain and heart problems and a poor prognosis. The last known contact that Paula had with Wright was in February or March 2006, when she was seven or eight months pregnant. Paula gave birth to her son, Alijah, on April 9, 2006.

Over the next year, Paula attempted to get Wright to acknowledge his paternity of Alijah and meet his financial obligations to Alijah. She hired an attorney to assist her with a paternity action. Paula and her attorney sent letters to Wright's supervisors in the Air Force, informing them that Wright had an extramarital child and that he refused to recognize his support obligations. Paula also sent a similar letter to Wright's then-wife, Jodi, and created a website, on which she criticized Wright for failing to support Alijah. Wright was finally served with the paternity action on June 12, 2007. Wright failed to file a timely response, which was due by July 2, 2007.

On July 6, 2007, Paula and fifteen-month-old Alijah were found murdered in their St. Petersburg home. The cause of death for both victims was asphyxiation. Although law enforcement identified Wright as the primary suspect almost immediately after the murders, a warrant for his arrest was not obtained until December 2008.

### A.  Events Prior to the Murders

Paula had been involved with men besides Wright, including two St. Petersburg police officers, Officer Truong—who was married—and Officer Harris. Around the time of her death, Paula had a sexual relationship with another married man, Neil Hunt, her former mailman.

On July 3, 2007, Paula spent the afternoon at home, swimming in her pool with Hunt. Tori was at the house with an ex-boyfriend, Matt Jaynes. Another of Tori's ex-boyfriends, Michael Cosmos, was also there working on Paula's plumbing. There was a guitar on Paula's couch, and Paula said she wanted to learn to play it. That night, Hunt sent Paula several text messages, saying, "I always leave your house wanting more, and I don't know if that's . . . a good thing or bad thing. I'm not Ron"; "I don't have the words. Maybe we shouldn't end up together because I would spend the rest of my life trying to make you happy"; and "I'm such a sucker for you. Miss you. XOXOXO."

Tori had moved out of Paula's house in September 2006, when she was eighteen years old. Until that time, Tori was taking care of Alijah when Paula was at work, but after Tori moved out, Paula started taking Alijah to a babysitter during the day. At one point after moving out, Tori went into Paula's house and took some items. As a result, Paula took away Tori's key and changed the locks.

Some witnesses described the relationship between Tori and Paula as volatile. In 2006, Tori dated Michael Brophy, who was in the military at the time. Brophy recalled an incident in 2006 where Paula and Tori were screaming at each other and he had to physically remove Tori by carrying her out of the house while she was kicking and screaming. Brophy and Tori broke up in December 2006, when Brophy found out that Tori was dating Cosmos and living with him at his parents' house. At first, Paula did not approve of Tori's relationship with Cosmos, but she eventually warmed up to Cosmos and sometimes had him do handyman work around her house.

In April or May 2007, Tori moved out of Cosmos's parents' house, started dating Jesse Baynard, and moved into Baynard's bedroom at his family's house. Tori continued to live at Baynard's family's house until she and Baynard broke up after Paula's and Alijah's funeral on July 13, 2007. When living with Baynard, Tori was unemployed, did not have a checking account, and would ask Paula for

gas money. Baynard was also not working at the time, so his mother was paying for everything for both him and Tori.

On July 4, 2007, Paula, Alijah, Tori, and Baynard went to a barbeque together. Tori and Baynard left early. Tori dropped Baynard off at his house and left. Baynard—who Tori thought was divorced but who was actually still married—then had his wife pick him up and they followed Tori to Cosmos's house. A confrontation and car chase ensued, during which Baynard and his wife were screaming at Tori. After the chase, Tori returned with Cosmos to the barbeque to rejoin Paula and Alijah. Because Paula had been drinking, Tori drove Paula and Alijah home in Paula's car, and Cosmos followed. When they arrived at Paula's house, all four of them went inside, and Tori put Alijah to bed. She and Cosmos left after half an hour. Tori took Cosmos home and then spent the night at Baynard's house, despite the earlier confrontation and car chase.

The next day, July 5, Tori was supposed to pick up Alijah from Paula's house and take him to a physical therapy session, but she called Paula that morning and said she was not coming. Neither Tori nor Baynard remembered what they did during the day on July 5, but they did remember going swimming that evening at a pool at a condominium complex where they did not know anyone. They said that they returned to Baynard's house after swimming and stayed in his room for the

rest of the night. They did not see or speak to Baynard's parents that night, so no one could verify that they were home all night.

Tori stated that she spoke to Paula on the phone at 8 p.m. on July 5. Michael Brophy—who had not spoken to Tori since their break up in December 2006—said that Tori called him that night. He hung up on her because they broke up on a bad note and he did not have anything to say to her. Tori texted him immediately after the hang up and was mad that he did not want to talk to her and had not forgiven her. Tori testified that she did not remember calling Brophy that night or why they broke up. Tori also testified that she woke up at 4 a.m. or 5 a.m. on the morning of July 6, 2007, and saw Baynard sleeping next to her.

Wright was on leave from work July 4-6, 2007. He told a coworker that he planned to go to the Fourth of July Daytona races. But when the coworker saw Wright on the base at 10 a.m. on July 6, Wright said his plans fell through. Wright also made July 4 plans with two women—one of whom had previously had a sexual relationship with Wright and the other of whom thought she was in a serious relationship with Wright at the time—but he did not show up for either of those plans.

On the morning of July 6, 2007, Neil Hunt texted Paula at 6:28 a.m., but she did not respond, which was unusual. At 6:56 a.m., Hunt called both Paula's home and cell phones but got no answer. At that point, Hunt became concerned and

went by Paula's house around 7 a.m. He saw that her SUV was not in the driveway and figured she had gone out of town for the weekend.

## B. The Murder Investigation

When Paula did not show up as expected at the insurance company where she worked on the morning of July 6, 2007, her coworkers contacted her attorney, who was listed as her emergency contact. Paula's attorney sent his investigator, John Zurenda, to Paula's house. Zurenda called Tori and asked her to meet him there. Tori arrived with Baynard shortly thereafter. Once entry was made into the locked house by removing one of the doors, the bodies were discovered in Alijah's bedroom—Paula's body was on the floor and Alijah's body was in his crib. St. Petersburg Police Officers Blackwood and Truong cleared the house. At the time, Officer Truong did not tell Officer Blackwood that he knew Paula socially and had been to her house recently.

Tori became extremely emotional upon learning that her mother and brother were dead. Shortly after the bodies were discovered, Tori called Michael Brophy to tell him that her mother and brother were dead, even though her only contact with him since their breakup the previous December was when he hung up on her the night before.

That afternoon, Neil Hunt learned about the murders from a friend. He finished his mail route and then went to Paula's house to tell the police that he

could not get in touch with Paula that morning and that he went by her house at 7 a.m. and saw that her SUV was not there.

Crime scene investigators spent two days processing Paula's house. On the arm of the couch immediately next to the front door and abutting Paula's guitar, investigators found a single black glove. The house was not ransacked and nothing appeared to be missing, but there were indications that a struggle had taken place in the dining and living areas before Paula was killed in Alijah's bedroom. Cards and jewelry with romantic inscriptions from Wright were found in Paula's bedroom.

Paula's SUV was located at an apartment complex approximately a half mile from her house during the afternoon on the day the bodies were discovered. A bag on the back seat contained photographs of Alijah in a hospital bed with tubes attached to him, of Paula and Wright kissing, and of Wright sitting on Paula's couch. A newspaper delivery man said that he had seen Paula's SUV parked in front of her house at 4:45 a.m. The apartment complex resident who was assigned the space in which the SUV was found said that he left for work at 5:30 a.m. And another resident of the apartment complex said that he had seen the SUV parked in the space where it was found at 6:15 a.m. Based on the witness statements and the time of death estimated by the medical examiner, investigators concluded that the murder occurred between roughly 5:30 a.m. and 6:15 a.m. on July 6, 2007.

A latent print analyst compared the known fingerprints of Paula, Tori, Baynard, Wright, Hunt, and Cosmos to latent prints lifted from Paula's house and SUV. Latent prints lifted off a window on the back of Paula's house and the exterior of the driver's door of Paula's SUV were identified as Tori's. None of the prints found on or in the SUV or the house were matched to Wright.

Detective Sauer was assigned to the case as the lead detective. From his observations of the exterior and interior of Paula's house, he did not believe that the killer used forced entry or that the motive was burglary or robbery. A rape kit later revealed that Paula was not sexually battered. Detective Sauer decided to focus the investigation on finding out who killed Alijah because he could not think of any reason for anyone to kill a baby.

Detective Sauer quickly learned about Paula's relationship with Wright and he went to MacDill in the afternoon on July 6 to interview Wright. The first question Detective Sauer asked Wright was about his relationship with Paula, and Wright responded, "That girl has been a thorn in my side." Wright said that he met Paula at a barbeque in 2004 but denied having a sexual relationship with her. Wright mentioned the letters that Paula and her attorney sent to his commanders at MacDill and said he thought that they were just attempts to get him fired. Wright knew that Paula wanted the military to pay for Alijah's medical expenses and he knew that his military health benefits would cover Alijah's medical expenses if

Alijah was his son. Wright repeatedly denied that he was Alijah's father and said that he had not had contact with Paula since November 2005. When Detective Sauer told Wright that Paula and Alijah were dead and asked him if there was anything or anybody he should be investigating, Wright mentioned that Paula was having problems with Tori and Tori's boyfriends. That evening, Wright consented to Detective Sauer searching his car and his townhouse. The only noteworthy item Detective Sauer found during either search was a receipt in Wright's car from a Starbucks near the base, dated July 6, 2007, at 7:53 a.m.

Over the next few days, Detective Sauer learned about the photographs found in Paula's SUV and the cards and jewelry found in her bedroom, all of which indicated that Paula and Wright had been more than just friends, as Wright claimed. He also learned that Tori stood to receive $540,000 from Paula's life insurance policies. On July 10, Detective Sauer interviewed Tori and Baynard, both of whom he described as being cooperative. Detective Sauer did not discuss the insurance money with Tori at that time. Detective Sauer talked to Cosmos on the phone on July 11. Cosmos initially said that on July 4, he and Tori dropped Paula off at her home and left, but in a subsequent interview, Cosmos admitted that he and Tori actually went into Paula's house for fifteen or twenty minutes when they dropped her off on July 4. Detective Sauer did not investigate whether Cosmos had an alibi for the time of the murders nor did he investigate Brophy.

Detective Sauer interviewed Wright again on July 12, 2007. Wright told Detective Sauer that he had July 4-6 off from work. Wright said he was up late on July 5 and may have gone to the base a few times to log on to his work computer. He was up past midnight but could not remember exactly when he went to bed. He said he woke up shortly after 7 a.m. on July 6 and went to a Starbucks near the base. He said he had not been to Pinellas County—where Paula's house was located—in three or four weeks. He maintained that he and Paula were just friends but admitted that he spent the night at her house a few times after they had been out drinking together.

Detective Sauer interviewed Hunt on July 18 and July 31. Hunt initially told Detective Sauer that he and Paula were just friends but when confronted with text messages during the second interview, Hunt admitted that he had not initially been truthful and that the relationship had been sexual. Detective Sauer did not speak to Hunt's wife or investigate where Hunt was at the time the murders occurred because he did not believe there was animosity between Hunt and Paula or that Hunt had a motive to kill Alijah.

Detective Sauer obtained video surveillance from the Starbucks near the base, which confirmed Wright was there at 7:54 a.m. on the morning of the murders. Detective Sauer timed the route from Paula's house to the apartment

complex where her SUV was found and then to the Starbucks. At 5:45 a.m., driving at the posted speed limit, the drive took Detective Sauer nineteen minutes.

Detective Sauer interviewed Wright for a third time in September 2007. By then, Detective Sauer had DNA evidence that Wright was Alijah's father and had focused the investigation solely on Wright. Wright reiterated that he had stayed up late on July 5 and had gone to the base several times during the night leading into July 6. He said he possibly went to the store on the base, and Detective Sauer told Wright that video surveillance from the store confirmed that Wright was there at 2 a.m. on July 6. Although Wright not was not scheduled to work on July 6, he woke up around 6:30 a.m. or 7 a.m. and was going to go to the base, but because there was a long line at the entrance to the base, he decided to go to Starbucks and to get gas first. Wright stated he slept on the couch when he stayed overnight at Paula's house. He said he might have sat on Paula's bed but had never been under the covers. Wright said that Paula sent him e-mails threatening to tell everyone he was Alijah's father if he did not help her. He said he did not even know that Paula was pregnant when she started making those threats and that he never associated with her while she was pregnant.

Detective Sauer told Wright that DNA analysis revealed that he was Alijah's father. Wright said that surprised him. He maintained that he did not have sex with Paula and said that he did not know what she was capable of doing. Detective

Sauer also told Wright that he had photos of Wright kissing Paula and sleeping in her bed. Wright denied doing either and stated that the photos could be doctored.

### C. The Trial

The State's theory as to how the murders occurred was that Wright entered Paula's backyard, dismantled the backyard light, powered his way into the house through the back door when Paula let her dogs out in the morning, fought with her in the dining and living areas before strangling her in Alijah's room, and then smothered Alijah in his crib. The State theorized that Wright had sufficient knowledge of Paula's routines and her house to carry out the murders. The State theorized that Wright was wearing black gloves when he entered Paula's house and that he left one of them on the arm of the couch as he was exiting through the front door. He then locked Paula's door on his way out and drove her SUV to the apartment complex where it was found.

The State asserted that Wright was motivated to commit the murders because he wanted to avoid paying child support and to continue his "bachelor lifestyle." The State argued that when Wright was served with the paternity suit on June 12, 2007, "the death clock started to tick" and that the murders were Wright's answer to the paternity petition. The State repeatedly told the jury that Wright was the only person in the world who had a motive to kill Paula and Alijah and spent a

substantial amount of time during trial presenting evidence to show that neither Tori nor her boyfriends were involved in the murders.

The defense argued that the murder investigation was inadequate because law enforcement was singularly focused on tying Wright to the murders while overlooking other potential suspects who also had motive and opportunity. Throughout the trial, the defense elicited testimony that implied that Tori, one of her boyfriends, or one of the other men in Paula's life could have been responsible for the murders.

Considerable evidence was presented at trial regarding the black glove. The glove was determined to be a size 8 Nomex summer flyer glove, which was manufactured under a military contract and distributed solely to the military. Hercules Glove Manufacturing Company produced 2,762 pairs of gloves that were identical to the glove found on Paula's couch. Both the interior and exterior of the gloves were handled by at least four or five people during the manufacturing process. The finished gloves were sent from the manufacturer to military distribution facilities in Pennsylvania and California between June 2004 and February 2007. Some of the gloves were delivered to a base where Brophy had been stationed.

Wright worked at the supply warehouse at MacDill, and one of his duties was to issue gear to servicemen. All of the employees within his division had a

key to the supply storage area. The numbers stamped on the glove found on Paula's couch indicated that it could have come from a batch of twenty-five gloves that arrived at MacDill in February 2007, but no clear inventory was kept and there was no record of how many of the gloves were in the supply bin at MacDill on July 6, 2007, or if any gloves were missing. Gloves are low-budget, throw-away items, which means people are not required to turn them back in before leaving MacDill. If individuals lose their gloves, another pair is simply reissued. It is not unusual for people to exchange, give away, or let others borrow their gloves.

A coworker of Wright's testified that he saw Wright wearing black Nomex flyer gloves on at least two occasions between March and July of 2007. The coworker described the gloves as common "everyday duty" gloves, which are often worn by people in the warehouse when performing general warehouse duties. He did not know the age, size, or anything else about the gloves that he saw Wright wearing.

The State had both the Florida Department of Law Enforcement (FDLE) and a private laboratory, Bode Technology (Bode), conduct DNA analysis on the glove found on Paula's couch. The FDLE analyst obtained a DNA profile from the inside of the glove, which she concluded was a mixture of the DNA of at least two individuals. The FDLE analyst opined that neither Paula, nor Alijah, nor Wright could be excluded as possible contributors to the mixture. The mixture also

contained alleles that did not correspond to the profiles of Paula, Alijah, or Wright. The FDLE analyst could not determine whether or not Hunt may have contributed to the mixture. She testified that the combined frequency of occurrence of the DNA profile in the mixture for unrelated individuals was approximately 1 in 35 Caucasians, 1 in 83 African Americans, and 1 in 34 Southeastern Hispanics. The FDLE analyst used only one swab to swab the entire inside of the glove, so she could not say from where inside the glove any of the DNA was obtained.

The FDLE analyst also obtained DNA profiles from three areas on the outside of the glove—the fingers, palm, and wrist—all of which were mixtures. The FDLE analyst concluded that the major contributor to each mixture was consistent with or matched Paula's DNA profile and that neither Alijah nor Wright could be excluded as possible minor contributors to the mixtures.

DNA analysis was also done by FDLE on other items. No DNA matching Wright's profile was located in Paula's SUV or on her keys. A swab of the right side of Paula's neck contained a mixture from which Wright and Alijah could not be excluded as possible contributors. The FDLE analyst testified that Wright, Alijah, or both of them could have contributed to that mixture, but she could not differentiate between the two because they were father and son.

Bode conducted DNA analysis on the area inside of the glove where the back of the hand would be when the glove was worn, between the knuckles and

- 16 -

wrist. From that area, Bode obtained a DNA profile containing a mixture of the DNA of at least two individuals. Bode concluded that Paula and Alijah could not be excluded as possible contributors to the mixture but that Wright was excluded as a possible contributor to a reasonable degree of scientific certainty.

The defense hired DNA Diagnostic Center (DDC) to perform independent DNA analysis on the glove. DDC swabbed the entire inside of the glove and obtained a DNA mixture profile. DDC excluded Wright as being a possible contributor to the DNA mixture it obtained from the glove. DDC agreed that Wright could not be excluded as a possible contributor to the mixture obtained by FDLE from the inside of the glove. The DDC analyst testified that the probability of an unrelated individual having contributed to that mixture was 1 in 34. But DDC disagreed with FDLE's conclusions regarding the swabs FDLE obtained from the outside of the glove. DDC concluded that Wright could not have contributed to two of the swabs obtained by FDLE from the outside of the glove, and that it could not be determined whether or not Wright could have contributed to the third swab FDLE obtained from the outside of the glove due to insufficient information. DDC agreed with Bode that Wright was excluded as a possible contributor to the DNA mixture Bode obtained from the inside of the glove.

Tori testified at trial that prior to July 6, 2007, she did not know that Paula had any life insurance or even what life insurance was. Tori admitted that she

called Paula's employer on July 9, 2007, to ask if there was a life insurance policy but claimed that she did so because she thought somebody at the crime scene told her that Paula had life insurance through her employer. Tori learned that she was the beneficiary of a $40,000 policy through Paula's employer. Tori subsequently learned from State Farm Insurance that she was the beneficiary of a $100,000 policy and that Alijah was the primary beneficiary of a $400,000 policy but because Alijah was deceased, she would receive the payout from the $400,000 policy. Tori went in for a meeting with State Farm on July 13, the same day as the funeral. Tori ultimately received life insurance payouts totaling $540,000. She spent all of that money within about a year and a half of receiving it even though she testified that she had no debts or anything she wanted or needed money for at the time of the murders. Law enforcement never asked Tori what she did with the money.

Tori denied any involvement in the murders. She did not remember whether or not she was asked to provide a DNA sample. Tori did admit that she and Paula broke into Wright's townhouse in 2005 to snoop around and, therefore, she knew how to access Wright's home if she needed anything. Tori moved back into Paula's house after it was released as a crime scene. Tori's best friend testified that part of the reason Tori had moved out of the house in September 2006 was the stress she felt from having to care for Alijah while Paula worked.

Wright's ex-wife, Jodi—who divorced Wright in 2010—testified that in May 2006, she was visited at her home by John Zurenda, who was trying to locate Wright in order to serve him with the paternity suit. Zurenda showed her pictures of Paula and Wright kissing and of Alijah. Jodi confronted Wright and told him that their marriage would be over if it turned out that he was Alijah's father or if he refused to take a paternity test. Jodi said that during the summer of 2007, Wright made it clear to her that he did not want a divorce.

There was also testimony from Wright's coworkers that before the murders, Wright complained to them that Paula was alleging that he was Alijah's father. Wright showed them the website on which Paula criticized him for failing to support her and Alijah. He denied having a sexual relationship with Paula and told one coworker that he did not even know her.

Wright did not testify at trial. After the guilt phase, the jury returned general verdicts finding him guilty of the first-degree murder of each victim. After the penalty phase, the jury recommended that sentences of death be imposed for each murder by votes of 7-5. The trial court ultimately followed the jury's recommendations.

## II. ANALYSIS

On direct appeal in death penalty cases, it is our duty to independently review the record to ensure that there is competent, substantial evidence to sustain

the jury's verdicts.  See Fla. R. App. P. 9.142(a)(5); Dausch v. State, 141 So. 3d 513, 517 (Fla. 2014); Caraballo v. State, 39 So. 3d 1234, 1243 (Fla. 2010).  There is sufficient evidence to sustain a conviction "if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt."  Johnston v. State, 863 So. 2d 271, 283 (Fla. 2003).  But where, as here, the evidence of guilt is wholly circumstantial, "not only must the evidence be sufficient to establish each element of the offense," it must also "be inconsistent with any reasonable hypothesis of innocence proposed by the defendant."  Twilegar v. State, 42 So. 3d 177, 188 (Fla. 2010).  "Th[is] special standard requires that the circumstances lead 'to a reasonable and moral certainty that the accused and no one else committed the offense charged.  It is not sufficient that the facts create a strong probability of, and be consistent with, guilt.  They must be inconsistent with innocence.' "  Lindsey v. State, 14 So. 3d 211, 215 (Fla. 2009) (quoting Frank v. State, 163 So. 223, 223 (Fla. 1935)).  "Although the jury is the trier of fact, a conviction of guilt must be reversed on appeal if it is not supported by competent, substantial evidence."  Ballard v. State, 923 So. 2d 475, 482 (Fla. 2006) (quoting Crain v. State, 894 So. 2d 59, 71 (Fla. 2004)).

Finally, this Court has instructed that "[s]uspicions alone cannot satisfy the State's burden of proving guilt beyond a reasonable doubt[.]"  Ballard, 923 So. 2d at 482.  In fact, we have held that "even a 'deep suspicion the appellant committed the crime charged is not

- 20 -

sufficient to sustain [a] conviction.' " Lindsey, 14 So. 3d at 216 (quoting Williams v. State, 143 So. 2d 484, 488 (Fla. 1962)).

> Evidence which furnishes nothing stronger than a suspicion, even though it would tend to justify the suspicion that the defendant committed the crime, [ ] is not sufficient to sustain [a] conviction. It is the actual exclusion of the hypothesis of innocence which clothes circumstantial evidence with the force of proof sufficient to convict. Circumstantial evidence which leaves uncertain several hypotheses, any one of which may be sound and some of which may be entirely consistent with innocence, is not adequate to sustain a verdict of guilt. Even though the circumstantial evidence is sufficient to suggest a probability of guilt, it is not thereby adequate to support a conviction if it is likewise consistent with a reasonable hypothesis of innocence.

Dausch, 141 So. 3d at 518 (quoting Ballard, 923 So. 2d at 482) (alterations in original).

Hodgkins v. State, 175 So. 3d 741, 746-47 (Fla. 2015) (alterations in original).

In this case, none of the evidence presented at trial directly tied Wright to the murders. Most of the State's evidence was intended to show that Wright had a motive to commit the murders and that other potential suspects did not. The State presented evidence to support its theory that Wright's motive in killing Alijah was to avoid paying child support and that his motive in killing Paula was to maintain his "bachelor lifestyle." There was also evidence that Wright wanted to remain married to Jodi, but Jodi would end their relationship if it turned out that he was Alijah's father. But evidence that a person has a motive to kill diminishes in evidentiary significance when others also have a motive. As the State wrote in a

- 21 -

pretrial memorandum of law, "A person with a motive to commit a particular crime is more likely to commit the crime than is a person about whom nothing is known. It is ideal if the defendant is the only person with such a motive." Wright was the only person who had a motive to kill Alijah to avoid a child support obligation and a divorce and he may have been the only person who had a motive to kill Paula in order to maintain a "bachelor lifestyle," but Tori had a $540,000 motive to kill them both.

The State presented evidence that the black military glove found on Paula's couch could have been used in the murders and that it could have been left there by Wright because he had access to that type of glove. But the State could not prove that Wright ever wore the glove, that he left it on Paula's couch, that it came from MacDill, or that it was even used in the murders. The State also presented evidence that Wright had no verifiable alibi on July 6, 2007, between 2 a.m., when he was captured on video at the store on the base, and 7:54 a.m., when he was captured on video at the Starbucks near the base; that the murders were likely committed between 5:30 a.m. and 6:15 a.m.; and that it was possible for Wright to have been at Paula's house during that timeframe and to have made it back to Tampa to be captured on the Starbucks video at 7:54 a.m. But the State was not able to prove that Wright was at Paula's house or even in Pinellas County on July 6, 2007. In fact, the State had no evidence that Wright had been to Paula's house

for more than fifteen months prior to the murders or that he had been to Pinellas County more recently than three or four weeks before the murders.

There was extensive testimony presented at trial about the DNA evidence on the glove, but it proved nothing about the identity of the killer. FDLE found that neither Wright nor Alijah—who, as father and son, shared half of their DNA—nor Paula could be excluded as possible contributors to mixtures of DNA found on the outside fingers, palm, and wrist areas of the glove or the swabbing taken by FDLE of the inside of the glove. Contrary to FDLE's findings, DDC excluded Wright as a possible contributor to the outside fingers and palm and the FDLE inside swabbing and concluded that results for the wrist area were inconclusive. DDC also excluded Wright as being a possible contributor to the mixture found on a swabbing of the inside of the glove taken by DDC. Bode, the private lab hired by the State, also excluded Wright as a possible contributor to a mixture it obtained from the inside of the glove where the back of the hand would be when the glove was worn. In the light most favorable to the State, the DNA evidence was equivocal. It did not establish that Wright's DNA was on the glove.

If the glove was in Paula's house prior to the murders, it is entirely reasonable and logical to expect that Alijah's DNA would have ended up on it, either by his direct contact with the glove or indirectly by Paula having transferred it to the glove. Alijah's direct or indirect contact with the glove likely would have

deposited the alleles he shared with Wright on or in the glove, making it seem as though Wright could have contributed to the DNA mixtures on and in the glove when in fact he may not have. There is simply no proof that Wright's DNA was on the glove or that it was used in the murders.

There is no fingerprint, footprint, blood, fiber, pattern impression, or other physical evidence tying Wright to the crime scene. There is no cell tower evidence placing him in the vicinity of the crime scene. There are no inculpatory statements. There is no murder weapon. The only evidence presented by the State to prove that Wright was the murderer is the fact that he had motive and opportunity. But while motive and opportunity might create a suspicion that Wright committed the murders, even deep suspicions are not sufficient to sustain the convictions.

The State argues on appeal that "there was direct evidence that Wright was in close proximity to the crime scene during the time frame of the murder[s]," based on the fact that Paula's SUV was parked at the apartment complex between 5:30 a.m. and 6:15 a.m., the drive from Paula's house to the apartment complex and then to the Starbucks near MacDill took Detective Sauer nineteen minutes, and the receipt found in Wright's car proved that he was at the Starbucks at 7:53 a.m. Answer Brief of Appellee at 62-63, Wright v. State, No. 14-2410 (Fla. July 20, 2016). The State misunderstands the concept of direct evidence. "Direct evidence

- 24 -

is evidence which requires only the inference that what the witness said is true to prove a material fact." Kocaker v. State, 119 So. 3d 1214, 1224 (Fla. 2013) (quoting Charles W. Ehrhardt, Ehrhardt's Florida Evidence § 401.1 (2012 ed.)); see also 1 Kenneth S. Broun, McCormick on Evidence § 185 at 1000-01 (7th ed. 2013) ("Direct evidence is evidence which, if believed, resolves a matter in issue."). The mere fact that it was possible for Wright to have left Paula's SUV at the apartment complex between 5:30 a.m. and 6:15 a.m. and been at the Starbucks at 7:53 a.m. does not mean that there is "direct evidence that Wright was in close proximity to the crime scene during the time frame of the murder[s]." The videos from the store on the base and the Starbucks provided the only direct evidence of where Wright was on the morning of July 6, 2007. The State presented no evidence, direct or otherwise, to show where Wright was between 2 a.m. and 7:53 a.m. that morning.

The State also claims that "[t]here is direct evidence of Wright's guilt but even if there was not direct evidence, the Appellant's hypothesis of innocence is unreasonable." Answer Brief of Appellee at 74, Wright v. State, No. 14-2410 (Fla. July 20, 2016). Again, there is no direct evidence of Wright's guilt. And Wright's hypothesis of innocence—that he was not present at the time of the murders and that someone else committed them—is not unreasonable considering the absence of any evidence to place him at the crime scene or prove his identity as the killer.

Wright's theory of defense—which implied that if the police had done a more thorough investigation, they would have discovered that Tori or another person was the real murderer—is a reasonable hypothesis. There was no physical evidence at the scene that was inconsistent with Tori or another person being the murderer. And there is no evidence to establish that Tori could not have contributed to the DNA mixtures on the glove because Tori's DNA was never analyzed. Like Wright, Tori claimed to be at home in bed at the time of the murders. Tori stated that she was in Baynard's bed with him at his parents' house, but only Baynard could verify her alibi. Moreover, the evidence showed that Tori had a volatile relationship with Paula, she felt burdened by the responsibility of caring for Alijah in the past, she was struggling financially at the time of the murders, and she stood to receive $540,000 of life insurance if both Paula and Alijah died.

In support of his argument that the evidence is insufficient to sustain his convictions, Wright relies on two recent cases—Dausch, 141 So. 3d 513, and Hodgkins, 175 So. 3d 741—in which we concluded the evidence was insufficient to sustain first-degree murder convictions. Dausch's DNA was matched to cigarette butts found in a murder victim's abandoned car with an infinitesimally small possibility of the same DNA profile occurring in the population at random. Dausch, 141 So. 3d at 516. Dausch was also a possible contributor to a DNA

- 26 -

profile obtained from anal swabs taken from the victim, with the frequency at which one would expect to find the same profile in the human population being a range from 1 in 29 Caucasians to 1 in 2900 Caucasians. Id. at 516, 519. We concluded that the DNA evidence on the cigarette butts was competent, substantial evidence to place Dausch inside of the victim's vehicle. Id. at 518. But the DNA on the anal swab taken together with the fact that Dausch was excluded as a source of semen stains found on a sheet that was used to bind the victim and excluded as a contributor to DNA recovered from the victim's fingernails, led us to conclude that the evidence was insufficient to support the jury's verdict. Id. at 519.

The instant case has both similarities to and differences from Dausch. Dausch was tied to the victim's car close in time to the murders, but he had no clear motive for the murder. No evidence placed Wright anywhere closer than a nineteen-minute drive from the victims' home near the time of the murders, but Wright did have a motive. The probability of an unrelated individual having contributed to the mixture of DNA obtained from FDLE's swabbing of the inside of the glove, according to FDLE, is approximately 1 in 35 Caucasians, 1 in 83 African Americans, and 1 in 34 Southeastern Hispanics. But one expert excluded Wright as a possible contributor to that mixture. Moreover, this case is complicated by the fact that Alijah and Wright shared half of their alleles and the fact that foreign alleles were present. And even if Wright could have been tied to

- 27 -

the glove, he would still not be linked to the murders because there is no competent, substantial evidence to establish a nexus between the glove and the murders.

In order for the DNA on the glove to be considered evidence of Wright's guilt, it would have to be inferred that Wright contributed to the mixtures on the glove rather than or in addition to Alijah, that inference would then have to be stacked on the inference that Wright left his DNA on the glove at the time of the murders, and then those inferences would have to be stacked on the inference that the glove was used in the murders. But such stacking of inference upon inference is insufficient to support the convictions. See Baugh v. State, 961 So. 2d 198, 205 (Fla. 2007) ("[E]vidence is insufficient to support a conviction when it requires pyramiding of assumptions or impermissibly stacked inferences."); Miller v. State, 770 So. 2d 1144, 1149 (Fla. 2000) ("[T]he circumstantial evidence test guards against basing a conviction on impermissibly stacked inferences.").

In Hodgkins, a DNA profile consistent with that of Hodgkins' DNA was detected underneath the victim's fingernails. 175 So. 3d at 744. Hodgkins told law enforcement that he had sex with the victim three days before she was murdered and that she left scratches on his back during the encounter. Id. at 745. To rebut Hodgkins' hypothesis of innocence, the State presented evidence of the victim's cleaning habits at home and at work, including that she spent three

minutes each time she washed her hands, observations of the victim's cleaning and handling raw foods at her job in the three days before the murder, and expert testimony that the DNA material collected from the victim's fingernails was robust when collected but would not have remained under the victim's fingernails during the three days between Hodgkins' last encounter with her and her murder. Id. at 747. Despite the evidence presented to rebut Hodgkins' hypothesis of innocence, in concluding that the DNA evidence was not sufficient to sustain Hodgkins' conviction, we noted that the DNA was the only evidence connecting Hodgkins to the murder but the State presented no direct evidence of how the DNA came to be under the victim's fingernails. Id. at 748. We also noted that none of the fingerprints lifted from the crime scene belonged to Hodgkins, there was no evidence that the murder weapon was recovered, no eyewitnesses placed Hodgkins in or around the victim's apartment at the time of the murder, and Hodgkins made no admissions concerning the murder. Id. at 748-49.

Although there was direct evidence that three days before the murder, the victim appeared aggravated after conversing with Hodgkins at her apartment door, there was no evidence corroborating the substance of that conversation or confirming that the conversation later incited Hodgkins to kill the victim. Id. at 749. Reiterating that "the circumstantial evidence test guards against basing a conviction on impermissibly stacked inferences," "we refuse[d] to surmise that [the

victim's] manifested demeanor somehow denote[d] Hodgkins' criminal intent towards her." Id. (citing Ballard, 923 So. 2d at 482).

We also concluded that Hodgkins' hypothesis of innocence—that after he last had innocent contact with the victim, she was killed by someone else who left no detectable forensic evidence at the crime scene—was bolstered by other facts, such as: the victim's spare key was missing; there were no signs of forced entry; the victim sometimes hosted coworkers, parties, and cookouts at her apartment; the victim dealt drugs out of her apartment; and the victim's drug dealer ex-husband used to beat her. Id. at 751. We found such evidence consistent with the possibility that anyone who knew the hidden location of the victim's spare key could have used it to gain access to her apartment and kill her. Id. ("In fact, the evidence, and especially the lack of forced entry into the apartment, generates the theory that the unidentified assailant was invited into the apartment with [the victim]'s consent, killed her, and then locked the apartment on the way out using the spare key.").

Here, the evidence connecting Wright to the murders is even more tenuous than the evidence in Hodgkins.

## III. CONCLUSION

The evidence presented in this purely circumstantial case does not establish "a reasonable and moral certainty that the accused and no one else committed the offense[s] charged." Lindsey, 14 So. 3d at 215 (quoting Frank, 163 So. at 223). Although the facts established at trial support a strong suspicion of guilt, they are not inconsistent with innocence. We therefore conclude that the evidence is insufficient to sustain Wright's convictions. Accordingly, we reverse the convictions, vacate the sentences of death, and remand with directions to enter judgments of acquittal.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, and LAWSON, JJ., concur.
CANADY, J., concurs with an opinion, in which LABARGA, C.J., and POLSTON, and LAWSON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., concurring.

Even absent the reasonable-hypothesis-of-innocence special standard of review that is applied in cases in which the evidence of guilt is wholly circumstantial, I would conclude that the evidence presented at Wright's trial is insufficient to sustain his convictions under the standard of review that otherwise applies. See Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002) ("If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find

the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction."). Here, no rational trier of fact could have found the existence of all the elements necessary to prove Wright guilty of the murders—specifically, the identity element—beyond a reasonable doubt.

LABARGA, C.J., and POLSTON, and LAWSON, JJ., concur.

An Appeal from the Circuit Court in and for Pinellas County,
    Thane Bobbitt Covert, Judge - Case No. 522008CF026620XXXXNO

Howard L. "Rex" Dimmig, II, Public Defender, and Karen M. Kinney, Assistant
Public Defender, Tenth Judicial Circuit, Bartow, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; Vivian Singleton,
Assistant Attorney General, Daytona Beach, Florida; and Christina Z. Pacheco,
Assistant Attorney General, Tampa, Florida,

    for Appellee