DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**CHRISTOPHER VASATA,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-2274

[January 6, 2021]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Joseph George Marx, Judge; L.T. Case No. 502017CF002808A.

Carey Haughwout, Public Defender, and Paul Edward Petillo, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Melynda L. Melear, Senior Assistant Attorney General, West Palm Beach, for appellee.

MAY, J.

A triple murder on Super Bowl Sunday 2017 and the resulting convictions and sentence bring this case to our court. The defendant appeals his convictions for murder, attempted murder, and grand theft. He argues the trial court erred in: (1) failing to make findings on the voluntariness of his statement to law enforcement; (2) failing to give the independent act instruction; (3) making two evidentiary rulings; (4) overruling the defense objection to a State comment in closing; and (5) finding the evidence sufficient to go to the jury on the grand theft auto charge. We disagree with these arguments and affirm.

The night before the shootings, the defendant, victim, and another friend, Sean, went to the victim's house to look at guns and ammunition. All three were involved in the drug trade. The victim was also known to sell guns. The three men discussed a fourth man named Luke, who was also the defendant's friend. The victim and Sean suspected Luke of burglarizing another friend's house. They wanted to "get back at him," and wanted to know if killing Luke would adversely affect the defendant.

The following night, the victim, Sean, and two other friends were sitting in the victim's backyard by a firepit. As they talked, the victim heard what sounded like firecrackers, but turned out to be gunshots. When the victim looked up, he saw several gun flashes coming across the yard. He saw two distinct muzzle flashes, one much larger than the other.

The victim saw two or three masked individuals but could not identify them. He explained it was dark and the shooters were dressed in dark clothing. As the gunmen approached, he fell out of his chair. He got up and ran towards some bushes, leapt over a fence, and knocked on his neighbor's door to ask for help. The neighbor told him to hide, closed the door, and called 911.

The victim hid behind a couple of trash cans where he saw the shooters go to Sean's blue Honda Accord parked in his driveway. He saw one individual help another, who appeared injured, into the car. Before the car backed out, a neighbor standing outside heard one of them say: "get in the f—ing car".

After the car left, the victim returned to his house. When he checked his backyard, he saw his female friend sitting in her chair. She appeared to be dead. The victim became frantic and ran to another neighbor's house to get help. Minutes later, a police officer responded to the scene.

The victim flagged the police officer down and told him three gunmen entered his backyard and began shooting. He told the officer to get help and that a girl in his backyard had been shot. The victim did not say much because he was having a panic attack and was taken to the hospital.

Shortly after the shooting, deputies in the area saw a dark-colored sedan run a red light. The deputies chased the car. As the car came to a stop, they saw the defendant fall out of the car's back seat. The dark sedan sped off. One of the deputies stayed with the defendant to assist him.

The deputy noticed the defendant had been shot in the groin. Unaware of the shooting, the deputy asked him what happened. The defendant said, "they shot me." When the deputy asked him where it happened, he replied at my "buddy's house."

The deputy checked the defendant's pockets for identification and found a firearm magazine and loose bullets. The deputy also found a glove lying on the street.

The defendant was taken to the hospital. Before going into surgery, a police detective asked him a few questions. At that time, the detective did not know the defendant was a suspect; she only knew him as the fourth person shot.

The detective noticed the defendant was in a lot of pain, but conscious. She asked him what happened. The defendant told her that he had been at his friend's house sitting out by the fire when an unknown person shot him. The detective asked him if his friends put him in the car and drove away, but he said he did not know.

The stolen Honda Accord was found abandoned on I-95; it had run out of gas. The police found a black hoodie, a blood-stained black t-shirt, and a blood-stained glove in the backseat. There was blood throughout the car.

In a nearby culvert, police found: a rifle, a revolver, a hoodie, and gloves. A BMW key fob was found inside the hoodie. When police found the BMW, they noticed it was parked near the same street where the defendant had fallen out of the Honda's backseat. They also noticed the BMW was parked close to a footpath that led to the victim's house. Inside the BMW, investigators found the defendant's driver's license and debit card, a business card for Luke, a rifle bag, an empty gun case, and a sock with bullets in it.

The State introduced video surveillance from the neighborhood that showed the BMW pulling into a parking spot near the footpath on the night of the shooting. The video then shows two people running towards the footpath.

The three homicide victims were found in the victim's backyard, all dead from gunshot wounds. A Glock pistol was found at the scene. Forensic examiners later determined the magazine and bullets found in the defendant's pocket could have been fired from the Glock pistol. A firearms examiner testified that the cartridges found in the backyard were fired from the rifle that police discovered inside the culvert. The investigators also found a blood trail on the victim's driveway.

DNA testing established the blood on the victim's driveway belonged to the defendant. The defendant's DNA was also found on the rifle, gloves, and hoodie that were found in the culvert. Forensic examiners determined the blood inside the stolen Honda Accord belonged to the defendant. At trial, the victim testified that, contrary to the defendant's claim, the

defendant was not sitting with him and the other victims on the night of the shootings.

The State charged the defendant and a co-defendant with three counts of first-degree murder, one count of attempted first-degree murder, and grand theft auto. The Indictment alleged the defendant and his co-defendant parked the BMW in the nearby neighborhood and used the footpath to get to the victim's house. According to the State, the shooters planned to kill the victim and Sean.

As soon as they reached the victim's backyard, the defendant and co-defendant began shooting. There could have been a third shooter, but there was no evidence that Luke was there that night. The State's theory was that as the shooting went on, the co-defendant accidentally shot the defendant in the groin. The co-defendant or a potential third shooter helped the defendant get into Sean's Honda Accord as they fled the scene.

The defense claimed the defendant, his co-defendant, and Luke planned to go the victim's house to scare and intimidate the victim and Sean, but when they arrived, Luke abandoned the plan and began shooting. The defense claimed Luke shot the defendant with the rifle. Proof of this was the doctor's comment that the defendant's wounds were consistent with those of a high-powered rifle.

The defense argued that even though there was no physical evidence connecting Luke to the scene, it was unclear if Luke stayed home on the night of the attack like he told the police. The defense also claimed there was no proof the defendant intended to steal the car because the shooters dragged him into the car.

The jury found the defendant guilty as charged. The court sentenced him to life in prison without the possibility of parole. From his conviction and sentence, the defendant now appeals.

In his fifth issue, the defendant claims the trial court should have granted his motion for judgment of acquittal on the grand theft auto charge. He argues the State did not establish the element of specific intent. The defendant claims the State's theory that the perpetrators planned to steal the car all along is tenuous at best and the more reasonable hypothesis is that the perpetrators felt compelled to take the car after the defendant was unexpectedly shot.

The State responds the intent necessary for theft includes the intent to temporarily deprive. Further, the evidence does not support the

defendant's hypothesis that he was dragged into the stolen car after being shot because before the car backed out, a neighbor heard someone say, "get in the f—ing car now, the police are on their way." The State claims the defendant would have known they would need to steal a car to make a quick get-away. Thus, the trial court properly denied the defendant's motion for judgment of acquittal.

We have de novo review of the trial court's ruling on a motion for judgment of acquittal. *Harris v. State*, 289 So. 3d 962, 965 (Fla. 4th DCA 2020).

"Generally, an appellate court will not reverse a conviction that is supported by competent, substantial evidence." *Johnston v. State*, 863 So. 2d 271, 283 (Fla. 2003). "In moving for a judgment of acquittal, a defendant admits the facts in evidence and every conclusion favorable to the [State] that may be fairly and reasonably inferred from the evidence." *Turner v. State*, 29 So. 3d 361, 364 (Fla. 4th DCA 2010).

A person commits theft if he or she knowingly obtains or uses another person's property with the intent to temporarily or permanently: (a) deprive the other person of the right to use the property or benefit from the property or (b) appropriate the property for his or her own use. *See* § 812.014(1)(a)-(b), Fla. Stat. (2017). "Theft is a specific intent crime." *Spivey v. State*, 680 So. 2d 565, 566 (Fla. 1st DCA 1996).

The defendant argues the evidence does not support the grand theft auto conviction. He compares his case to *J.B. v. State*, 6 So. 3d 659 (Fla. 3d DCA 2009), where the Third District reversed with instructions to dismiss a theft charge because the State did not prove the element of intent. *Id.* at 660. *J.B.* is distinguishable.

There, a juvenile was charged with stealing a pair of police handcuffs when he ran away from the police as they were attempting to arrest him. *See id.* The court reasoned the juvenile's act of taking the handcuffs "was incidental to his flight" from an illegal arrest. *Id.* And, there was no evidence the juvenile intended to steal the handcuffs or deprive the police officer of her property. *See id.* "[W]e are sure [the juvenile] would have gladly relinquished any dominion . . . [of] the handcuffs if he only had the key to release them." *Id.*

Here, however, the evidence suggests the defendant would have known they would need to steal a car to make a quick get-away. The defendant parked his own car almost a mile away from the victim's house. Unlike *J.B.*, there is evidence to suggest the defendant intended to take the car

5

for his own use.  And contrary to *J.B*, the defendant would not have "gladly relinquished" dominion or control of the car as he fled from the scene.  The car was used for the defendant's benefit in fleeing the scene.  *See* § 812.014(1)(a)–(b), Fla. Stat.

In short, competent substantial evidence existed to submit the question of intent to the jury.  *See Harris*, 289 So. 3d at 965–66.  When viewing the evidence in the light most favorable to the State, the trial court did not err in denying the defendant's motion for judgment of acquittal.  We affirm.

We affirm on the remaining issues without further comment.

*Affirmed.*

FORST and KUNTZ, JJ., concur.

*        *        *

**Not final until disposition of timely filed motion for rehearing.**